IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KELLY LISTER, et al., )<br>)<br>    Plaintiffs, )<br>)<br>vs. )<br>)<br>PEPCO HOLDINGS, INC., et al., )<br>)<br>    Defendants. ) | Case No. RWT 12-CV-0866 |

### EXPERT REPORT OF GARY E. KILPATRICK, P.E. (Corrected)

Prepared on behalf of Defendants,
Kelly Lister Personal Representative of
The Estate of Seneca D. Eldridge

by

Gary E. Kilpatrick and Associates, P.A.
3397 Cherrybrook Drive
Jamestown, NC 27272
Corporate License No. C-2279
North Carolina State License No. 027030
Maryland State License No. 43433

Dated:  04/24/13

*[North Carolina Professional Engineer seal: Gary Evans Kilpatrick, 027030]*

*[Signature: Gary E. Kilpatrick]*
*4-24-13*

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KELLY LISTER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. RWT 12-CV-0866 |
| | ) | |
| PEPCO HOLDINGS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REPORT OF GARY E. KILPATRICK, P.E. (Corrected)**

**Prepared on behalf of Defendants,**
**Kelly Lister Personal Representative of**
**The Estate of Seneca D. Eldridge**

**by**

**Gary E. Kilpatrick and Associates, P.A.**
**3397 Cherrybrook Drive**
**Jamestown, NC 27272**
**Corporate License No. C-2279**
**North Carolina State License No. 027030**
**Maryland State License No. 43433**

**Dated: 04/24/13**

I.  **IDENTIFICATION OF EXPERT**

Gary E. Kilpatrick, PE of Gary E. Kilpatrick and Associates, PA. I have a Bachelor of Science degree in Mechanical Engineering from North Carolina State University. I have completed courses at North Carolina State University in my mechanical engineering curriculum: engineering statics and dynamics, dynamics of machines and vehicles, mechanics of vehicles, vibrations, strength of materials, machine design, thermodynamics, heat transfer and energy systems. I use the knowledge from these courses coupled with my training, research and experience to reconstruct motor vehicle, ATV and motorcycle accidents, to reconstruct industrial accidents and conduct product defect and failure analyses. I am licensed and certified before the North Carolina Board of Examiners for Engineers and Surveyors and The Maryland State Board of Professional Engineers as a professional engineer. I am a member of the National Association of Professional Accident Reconstruction Specialists (NAPARS), the ARC Network, the National Society of Professional Engineers (NSPE), the American Society of Mechanical Engineers (ASME), the Society of Automotive Engineers (SAE). I am also a correspondent with the National Academy of Professional Engineers (NAFE). I have completed numerous investigations and reports concerning product defect and failure analyses. For further information, please refer to my curriculum vitae, attached hereto as Exhibit A.

II.  **FACTUAL INFORMATION CONSIDERED AND OPINIONS TO BE EXPRESSED AT TRIAL**

For the reasons set forth below, including the facts and data I considered, it is my professional opinion based on a reasonable degree of engineering and scientific certainty that:

A. Executive Summary: The Potomac Electric Company, Incorporated also known as PEPCO subcontracted the C.W. Wright Construction Company to provide mechanical services to PEPCO in order to work on PEPCO's high voltage power line towers to remove old double dead end insulators and corona rings from the power line cables and replace them with new double dead end insulators and corona rings. On July 11, 2011, C.W. Wright Construction Company employees including Terry Weber who was the General Foreman, Frank (Jason) Hand who was a Foreman, Dustin Twenter who was a Lineman, Seneca (Nick) Eldridge who was a Lineman and Kyle Neilson who was a bucket truck operator reported to tower number 719W located at Marlboro Pike and Woodyard Road in Upper Maryland. The crew installed a block and tackle pulley system to the tower. This block and tackle system was used to lower and lift the power line cable connected to the free end of one of the tower's lower crossarms. The block and tackle system was suspended from the middle crossarm located above the lower crossarm on

one side of the tower. The crew then commenced to servicing the tower. Mr. Eldridge positioned himself at the free end of the lower arm where a power line cable was attached. Mr. Neilson then used a bucket truck to apply a load to the block and tackle system to lift and support the power line cable. Mr. Eldridge then un-pinned the power line cable from the lower tower crossarm's free end. Mr. Neilson using his bucket truck then lowered the power line cable to the ground below. The ground crew then changed out the insulators and corona rings. Mr. Neilson then used his bucket truck and attempted to lift the power line cable back up to the free end of the tower's lower crossarm where Mr. Eldridge was waiting. During this process, Mr. Neilson's truck rear wheels began to spin on the ground stalling his truck. The crew had determined that their block and tackle system had jammed. The block and tackle system was then modified by the ground crew where two more pulleys were then added to the system. A second bucket truck with a wench was then connected to the modified block and tackle system. Mr. Hand and Mr. Neilson then operated their trucks simultaneously and applied a load to the modified block and tackle system. Mr. Eldridge was still positioned at the lower crossarm's free end, and Mr. Twenter was also on the lower crossarm but was standing near the tower's center mast. The tower's middle crossarm suddenly bent downward allowing the block and tackle hardware to pin and crushed Mr. Eldridge against the lower crossarm where he was positioned. Mr. Twenter then yells to stop the process and calls for help. The crew then rushed to give aid and assistance to Mr. Eldridge. Mr. Weber called 911. The EMS arrived and started triage. The EMS confirmed that Mr. Eldridge had died.

B. Based on the Maryland OSHA report dated 11/23/11, the original block and tackle system was made up of two pulleys; one 8.5 ton pulley was suspended from the middle tower crossarm at approximately 13.5 feet from the tower's mast by two 15.5 foot wire rope slings (upper pulley) and a 4.5 ton pulley was attached to the base of the tower (lower pulley). A 1 inch diameter Sampson rope was then threaded through the bottom pulley and up through the top pulley. The upper end of the Sampson rope was then connected to a 52.5 inch long 0.75 inch diameter wire rope sling that in turn was attached to the power line cable. The lower end of the Sampson rope was then attached to the utility hooks of a bucket truck. The actual physical vertical alignment of the upper and lower pulley is not known at this time. According to the OSHA report, PEPCO engineers advised OSHA that the cable being lifted along with the 8.5 ton pulley and rope assembly weighted approximately 2365 lbs. The middle crossarm was also supporting by design the weight of another cable attached to its free end weighing approximately 2240 pounds. The OSHA report stated that C.W. Wright was cited for three violations: (1) 29CFR1910.184(f)(5)(iii) Wire rope slings that had crushed, bird caged or other damage resulting in distortion of the wire rope structure were not immediately removed from service. (2) 29CFR1910.269(q)(1)(i) Before elevating structures, such as, poles or towers, were subjected to such stresses as climbing, or the installation or removal of equipment

may impose, the employer did not ascertain that the structures were capable of sustaining the additional or unbalanced stresses. Where the poles or other structure cannot withstand the loads imposed, the pole or other structure was not braced or otherwise supported to prevent failure. (3) Labor and Employment Article Section 5-104(a) The employer did not furnish employment and a place of employment which were free of recognized hazards that were causing or likely to cause death or serious physical harm to employees.

C. According to the OSHA report and PEPCO's engineering drawings, the power line tower's middle crossarm was designed using two 5x5x0.75 inch structural steel angles forming a horizontal 30° "A" frame. The assembly was approximately 20 feet long from it connection point with the tower's mast to its free end. The rear and separated ends of these angles were attached to the center tower mast via bolted connections. The free end of the angles came to a common point. A piece of structural "C" channel was attached to the free end of these angles, and a piece of structural "T" was attached over the top of the angles and the structural "C" channel to form a gusset plate. The power line cable was attached to the outer leg of the structural "C" channel. Cross bracing existed between the 5x5x0.75 inch angles to give the assembly some horizontal rigidity. At the point where the angles come together at the free end, two smaller angle iron upper support members were also attached to the structural "T" gusset at approximately 21° to the "A" frame that were in turn connected to an upper point of the tower's center mast. Angular measurements were taken from an engineering drawing supplied by PEPCO. The lengths of the tower crossarms and the position of the block and tackle were supplied in the OSHA report and PEPCO's engineering drawings. See Exhibit D.

D. When the crew attempted to lift the cable after changing out the insulators and corona rings, the first bucket truck's rear drive wheels began spinning in the dirt and stalled the truck's movement. Based on a power point presentation created by C.W. Wright, the block and tackle system jammed at some point. The crew then modified the block and tackle system by mounted two additional pulleys to the tower's base in order to connect the second bucket truck to the Sampson rope to be able to create more lifting force to the power line cable. The second truck and its winch were then attached to the Sampson rope. See Exhibits E. According to the power point presentation, both trucks were then used to apply a load to the block and tackle system and lift the power line cable. When the cable was lifted to within approximately 6 inches from the crossarm's attachment point, the crossarm then bent downward allowing the block and tackle hardware to pin Mr. Eldridge against the lower crossarm where he was positioned crushing him to death. The crossarm bent downward adjacent to its rear bolted connections point at the tower's center mast. The 5x5x0.75 inch angles also bent downward where the wire rope slings were wrapped to support the block and tackle system. See Exhibits B. I performed a load and stress analysis on the middle crossarm structure to determine what the approximate

4

bending stresses were during the time the crossarm was loaded with the two power line cables and the weight of the block and tackle system. When the pulley was attached to the 5x5x0.75 inch angles using the 15.6 foot long wire rope slings, the Sampson rope pasted from the power line cable and wire rope sling up through the upper pulley and then it past downward toward the lower pulley. When tension was applied to the Sampson rope by both bucket trucks, it took approximately 2365lbs of tensile force generated through the rope to lift and support the power line cable. Since the rope went up through and down from the upper pulley, there were now two ropes with 2365lbs of tensile load on the upper pulley pulling downward on the corssarm. These sums to be approximately 4730lbs of force pulling on the crossarm assembly. Since the wire rope slings were suspending the upper pulley from the crossarm angles, they created an angle of approximately 13.32° with the upper pulley. In addition to the 4730lbs suspended on the upper pulley, a side load force was also created on each angle of approximately 276.2lbs. Assuming a load of 4730lbs was suspended from the already loaded middle crossarm and assuming that the lower and upper pulleys were positioned vertically in line with each other, I calculated a resultant bending stress adjacent to the bolted connection at the tower mast of approximately 157,156 psi in each 5x5x0.75 inch angle member. Each angle also experienced an axial compressive load of approximately 2555.354lbs. The angles may have also experienced a twisting moment created by the wire rope slings. See Exhibits B. The Von Mises stress in the each angle I calculated to be approximately 152,564.856 psi. Since the middle crossarm structure was being loaded by the block and tackle system using both bucket trucks simultaneously, the loads became larger than what one truck could create alone. The combined load of both trucks coupled with a possible non-uniform jerky movement may have creating dynamic impulsive forces to the block and tackle system. Dynamic impulsive loads are higher than static loads. When the crossarm began to bend, the angle's axial compressive forces coupled with the shear forces applied by the block and tackle system's wire rope slings aided in its collapse and therefore buckled. This crossarm structure was not designed to be loaded in this manner. I do not know how long this tower has been in service, but long term deterioration that could result in a reduced load capacity could be a factor.  If the lower pulley was not vertically aligned with the upper pulley, then additional side loading of the crossarm would result creating a more complex loading condition. This structure is a truss and was designed to carry a load at its nodes or end point only. When the structure was not being loaded by the block and tackle system and a second power line cable, I calculated the bending stress to be approximately 73,540.819 psi which is approximately 53.2% of the calculated bending stress above. It is not known at this time what grade of steel the angles were made from, but I anticipate high strength steel. According to the Machinery's Handbook 25th Edition, the yield strength of steels can range from approximately 30,000 psi to 228,000 psi and the ultimate strengths can range from 40,000 psi to 230,000 psi. If the bending stresses become larger than the yield strength of the metal, the beam will

begin to yield (bend). If the bending stresses continue to increase and further deform the beam, this initial bending work hardens the material until the material reaches its ultimate strength limit. If the bending stresses continue to increase, the beam will fail catastrophically. Structural angle does a poor job of distributing bending stress because its cross-section has no symmetry. The flanges of an angle can buckle during bending by spreading apart and flatten out or by collapsing inwardly. See Exhibits C.

E. PEPCO stated in the supplied documentation that the tower crossarms were not load rated at the locations where the block and tackle assembly was mounted to the 5x5x0.75 inch angles. Based on my review of the photographs of the tower's crossarm, the crossarm structure was not designed to accommodate another large load to be applied at an intermediate point along the length of the angles between their ends. The reason being is that the middle tower crossarm had no bracing at the load point or any other point along its length except for the ends. It was only designed to be loaded at the node point (free end) of the crossarm where a 2240 pound power line cable already existed. PEPCO was familiar with and knew the procedures that C.W. Write's employees were using and their work methods while working on their power line towers. See Exhibit F. The National Electrical Safety Code C2-2007 stated on page 203 and 209 "Crossarms shall be supported by bracing, if necessary, to support expected loads, including line personnel working on them...". See Exhibit G. According to this code, since PEPCO knew that C.W. Write could use a block and tackle system to service their towers, proper bracing should have been incorporated by design within the crossarms. Also See Exhibit H. for a photograph of a high voltage power line tower crossarm design that Duke Power utilizes. In reviewing the contract documents for PEPCO, I saw no documented PEPCO procedures on how to service their power line towers. PEPCO designed, built and owns their towers and have the engineering knowledge on the proper procedures to service them. A subcontractor such as C.W. Wright, if they do not have an engineering staff, will not have this engineering knowledge. So therefore, PEPCO should have provided C.W. Wright with detailed instructions on the proper methods to service their towers. These instructions should be tower specific since some towers may not have bracing while others do. So it would be in the best interest of PEPCO to develop these procedures to care for and protect their investments.

F. In my professional opinion, based on a reasonable degree of engineering and scientific certainty, PEPCO knew that C.W. Write could use a block and tackle system to service their towers. PEPCO did not design into their tower crossarms proper bracing to support this expected load. The National Electrical Safety Code C2-2007 stated on page 203 and 209 "Crossarms shall be supported by bracing, if necessary, to support expected loads, including line personnel working on them...". The lack of proper bracing within the tower's crossarm allowed the crossarm to fail and bend downward under this expected

load crushing Mr. Eldridge. In reviewing the contract documents for PEPCO, I saw no documented PEPCO procedures on how to service their power line towers. PEPCO designed, built and owns their towers and have the engineering knowledge on the proper procedures to service them. A subcontractor such as C.W. Wright, if they do not have an engineering staff, will not have this engineering knowledge. So therefore, PEPCO should have provided C.W. Wright with detailed instructions on the proper methods to service their towers. These instructions should be tower specific since some towers may have no bracing while others do. So it would be in the best interest of PEPCO to develop these procedures to care for and protect their investments. (I retain the right to modify or change my opinion in this report if new and/or additional information is presented to me through discovery)

### III. LIST OF FACTS AND DATA CONSIDERED TO SUMMARIZE AND SUPPORT OPINIONS

In forming my opinions, I relied on the following information and materials, in addition to my education and experience:

-Amended Complaint.
-Answer.
-Defendant Potomac Electric Company, Inc.'s Response To Request For Admissions of Fact.
-Defendant Potomac Electric Company's Response To Request For Production of Documents.
-Maryland OSHA Report, Letters and Photographs.
-PSC Report on Eldridge-Fatality 07/11/09.
-PEPCO Holdings Inc. Documentation.
-PEPCO Transmission Engineering Technical Specifications Replacing Insulators.
-PHI Service Company Construction Contract Standard Terms and Conditions.
-PHI Safety Services Preliminary Incident Report.
-Safety Acknowledgement Form.
-PEPCO Engineering Drawings of its Towers.
-Request For Proposal REP No. 2009-CSP-PEPCO-Insulator Replacement.
-Proposal.
-PEPCO Purchase Order 4500010850 to C.W. Wright Construction Company.
-C.W. Wright Maryland License.
-C.W. Wright Construction Company, Inc. Insulator Replacement Methods.
-C.W. Wright Power Point Presentation Dated July 11, 2009.
-Block and Tackle Hardware.
-Braden Winch Information.
-IEEE National Electrical Safety Code C2-2007.
-IEEE 524 Guide to the Installation of Overhead Transmission Line Conductors.
-Machinery's Handbook 25th Edition.

-Manual of Steel Construction 7th Edition.
-Photographs Taken of Duke Power's High Voltage Power Line Cable Towers Located Adjacent to EastChester Drive in High Point North Carolina.

### IV. EXHIBITS USED TO SUMMARIZE AND SUPPORT OPINIONS

Any and all photographs and/or diagrams produced in discovery as well as all exhibits referred to in this report.

### V. ENGAGEMENTS WHERE AN OPINION WAS EXPRESSED AT TRIAL

#### A. Sworn Testimony During Deposition Proceedings in the Last Four Years

To date, I have been subpoenaed to give sworn testimony under oath during the following depositions:

(1) January 9th, 2004 in Superior Court in Guilford County North Carolina case number 02 CVS 12697 Margaret Hilda Christy vs. Jamal Issa-Saliba Hanhan (Traffic Accident Reconstruction)

(2) July 3rd of 2006, in Superior Court in Guilford County North Carolina case number 05 CVS 5172 Mr. Tony and Sharon King vs. SKR Enterprises, Incorporated (Industrial Accident Reconstruction)

(3) January 16th, 2007 in the United States District Court for the Eastern District of North Carolina Western Division case number 1:06CV275 Richard Watson and Nancy Watson vs. Fleetwood Motor Homes of Indiana Inc; Freightliner Custom Chassis and Caterpillar Inc. (Recreational Vehicle Inspection)

(4) May 25th of 2007, in the General Court of Justice Superior Court Division in Guilford County North Carolina case number 06 CVS 18238 Ms. Harriet D. Lancaster vs. Garner TV & Appliance (Slip & Fall Case)

(5) April 7th of 2009, in the Court of United States District of Tennessee Southern Division case number 07-CV-249 Mr. Gene Angel and Wife Stella Angel vs. Sherwin-Williams Company and New Buffalo Tools Corporation d/b/a Buffalo Tools (Scaffold Failure Case)

(6) August 12, 2009, in the Circuit Court for Knox County, Tennessee case number 1-121-08 Delena and Cleve Miller vs. Harley-Davidson Motor Company Group Incorporated (Motor Cycle Product Liability Case)

(7) July 21, 2010, in the General Court of Justice Superior Court Division Case Number 09-CVS-19247, Julia Douglas vs. The Charlotte Mecklenburg Hospital Authority and The Carolinas Healthcare Foundation. (Trip and Fall Case & OSHA)

(8) June 2, 2011, in the United States District Court Western North Carolina 3:10-CV-00310, Quinston Anderson vs. The Raymond Corporation (Forklift Product Liability Case)

(9) November 7th, 2011, in the Circuit Court for the State of Tennessee Twenty-Ninth Judicial District, Dyer County at Dyersburg Case Number 2010-CV-28, Leslie Eastwood vs. Robert Bosch Tool Corporation (Power Hand Sander Case)

(10) January 27th, 2012 in the United States District Court Eastern District of North Carolina Eastern Division, Case Number 5:11-CV-57-FL, Scott A. Ferguson vs. Roger St. Clair and Ruan Transport Corporation (Electric Pallet Jack Case)

(11) March 30th 2012, in the Circuit Court of Kanawha County, West Virginia, Case Number 08-C-1668, Shannon R. Jones and Amber L. Jones vs. All Crane & Equipment Rental Corporation, Danser Incorporated, Lifting Gear Hire Corporation and Cajun Water Weight Rentals Incorporated, LLC. (Crane Case)

(12) June 14, 2012, in the Superior Court of Chatham County, Georgia, Case Number CV09-1831-BR, Anthony Clinch and Jocelyn Clinch vs. Superbike Specialties. (Motorcycle Case)

(13) October 05, 2012, in the Circuit Court of the 17th Judicial Circuit in and for Broward County Florida, Case Number 09-11280 (14), Bobert Sergei vs. Wilmar Corporation.
(Motor Vehicle Front End Suspension Spring Compressor Tool)

(14) December 07, 2012, in the Superior Court of New Jersey Law Division, Civil Part Ocean County Case Number L797.10, Alice Fraser and Ronald Fraser vs. Polaris Industries Inc., East Coast Power Sports (ATV Rear Tip Over Case)

(15) March 4, 2013 in the State of Louisiana Parish of Ouachita Fourth Judicial District Court Case Number 10-1772, Robert Brian and Lonetta Buff Barnard vs. Joshua Daniels Goss, Bayou Transport, 3PD Inc., Home Depot, Inc. and Vanliner Insurance Company
(Traffic Accident Reconstruction)

### B. Sworn Testimony During Court Trial Proceedings in the Last Four Years

To date, I have been subpoenaed to give sworn testimony under oath during the following court trials:

August 31st of 2006, in Superior Court in Guilford County North Carolina case number 05 CVS 5172 Mr. Tony and Sharon King vs. SKR Enterprises, Incorporated (Industrial Accident Reconstruction).

## VI. EXHIBITS TO BE USED AT TRIAL

Any and all photographs and/or diagrams produce in discovery.

## VII.   STATEMENT OF COMPENSATION

My billing rate is $200/hr. To date, I have been paid $1,600.00. My total bill for this case to date is $7,908.75. I am still owned $6,308.75 for my services in this case.