

# PLANET DEPOS
We make it » *happen.*

## Transcript of **GARY EVANS KILPATRICK, P.E.**

**Date:** April 23, 2013

**Case:** LISTER, ET AL. v. PEPCO HOLDINGS, INC., ET AL.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Court Reporting | Videography | Videoconferencing | Interpretation | Transcription

1 (Pages 1 to 4)

**1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF MARYLAND
3  --------------------x
4  KELLY LISTER, et al. :
5  Plaintiffs, :
6  v. : Case No. RWT 12-CV-0866
7  PEPCO Holdings, Inc.,:
8  et al., :
9  Defendants. :
10  --------------------x
11
12  Deposition of GARY EVANS KILPATRICK, P.E.
13  Highpoint, North Carolina
14  Tuesday, April 23, 2013
15  1:00 p.m.
16
17
18
19
20  Job No.: 36178
21  Pages: 1 - 147
22  Reported by: Cynthia S. Boyd

**2**

1  Deposition of GARY EVANS KILPATRICK, P.E.,
2  held at the offices of:
3
4
5  Wyatt Early Harris Wheeler
6  1912 Eastchester Drive
7  Highpoint, North Carolina 27265
8  (336) 884-4444
9
10
11
12  Pursuant to the Federal Rules of Evidence, before
13  Cynthia S. Boyd, RPR, and Notary Public in and for
14  the State of North Carolina.
15
16
17
18
19
20
21
22

**3**

1  A P P E A R A N C E S
2
3  For the Plaintiffs:
4  RICHARD S. PHILLIPS, Esq. (Via speakerphone)
5  The Phillips Law Firm
6  22 West Dover Street
7  Easton, MD 21601-8903
8  (410) 820-4455
9
10  For the Defendants:
11  MARK T. FOLEY, Esq.
12  Sasscer, Clagett & Bucher
13  5407 Water Street, Suite 101
14  Upper Marlboro, MD 20772
15  (301) 627-5500
16
17  Also Present:
18  Kelly Lister (Via speakerphone)
19
20
21
22

**4**

1  C O N T E N T S
2
3  EXAMINATION OF GARY EVANS KILPATRICK, P.E.    PAGE
4  By Mr. Foley                5
5
6  E X H I B I T S
7  (Retained by counsel)
8
9  KILPATRICK DEPOSITION EXHIBITS        PAGE
10  Ex. 1  Expert Report of
11  Gary E. Kilpatrick        5
12  Ex. 1A  Expert Report of
13  Gary E. Kilpatrick (Corrected)      6
14  Ex. 2  Gary Kilpatrick and Associates, P.A.,
15  Forensic Engineering Case Work History   27
16  Ex. 3  Handwritten Case Notes      113
17  Ex. 4  Page referred to in deposition from
18  Manual of Steel Construction      119
19
20
21
22

5

1           P R O C E E D I N G S
2       GARY EVANS KILPATRICK, P.E.,
3   the witness hereinbefore named, being first duly
4   sworn, was examined and testified as follows:
5               EXAMINATION
6   BY MR. FOLEY:
7       Q.  Please state your name for the record.
8       A.  Gary Evans Kilpatrick.
9       Q.  And your professional address?
10      A.  Would be 3397 Cherrybrook Drive, and
11  that's in Jamestown, North Carolina, zip code
12  27282.
13      Q.  And we're here pursuant to a Notice of
14  Deposition that I sent you regarding your review in
15  the case Lister versus PEPCO; is that correct?
16      A.  That's correct.
17      Q.  And let's start by marking right off the
18  bat Exhibit No. 1, which you gave me just before we
19  got started, which is your expert report and some
20  exhibits.
21      (Deposition Exhibit No. 1 was marked for
22  identification purposes.)

6

1       MR. FOLEY:  And then if you would mark
2   this as 1A.
3       (Deposition Exhibit No. 1A was marked for
4   identification purposes.)
5   BY MR. FOLEY:
6       Q.  Do you have a copy of this?
7       A.  Yes.  I've got a copy of both but I'll go
8   by the updated one.
9       Q.  For the record I'm looking at what is
10  marked as Exhibit No. 1, Expert Report of Gary E.
11  Kilpatrick (Corrected), and that is the report that
12  you handed me today?
13      A.  That's correct.
14      Q.  And in it it contains exhibits, and the
15  exhibits include your curriculum vitae; is that
16  correct?
17      A.  That's correct.
18      Q.  And directing your attention to the CV
19  which is listed as Exhibit A in Exhibit 1, does
20  this fairly and accurately set forth your
21  professional history and education regarding your
22  ability to testify as an expert in this case?

7

1       A.  Yes.
2       Q.  And giving me a little bit of the
3   highlights, you got an engineering degree from
4   North Carolina State in 1990?
5       A.  That's correct.
6       Q.  And you're a mechanical engineer?
7       A.  Yes.
8       Q.  Do you hold yourself out as any other type
9   of engineer?
10      A.  No.
11      Q.  And specifically in this case, you're not
12  an electrical engineer, correct?
13      A.  That's correct.
14      Q.  And looking at your postgraduate further
15  education, I see that you got an associate degree
16  in science.  That would have predated your
17  bachelor's, correct?
18      A.  That's correct.
19      Q.  Do you have any degrees or matriculation
20  after the bachelor's degree?
21      A.  At this point, no.
22      Q.  Are you in the middle of something?

8

1       A.  No, not right now.  I plan to be.
2       Q.  But you're not even pursuing a master's as
3   of yet?
4       A.  No, not yet.
5       Q.  And have you attempted to apply for any
6   schools regarding a master's degree?
7       A.  No.  If I do, I'll go to NC State.
8       Q.  And what is your intended goal if you do
9   pursue a master's?
10      A.  Just to further my education.  That's
11  about it.  More advanced courses, and so forth.
12      Q.  Is there any benefit that a master's
13  degree would give you, you believe?
14      A.  Probably not.
15      Q.  Since your graduation from North Carolina
16  State, it appears working backwards you have been
17  in forensic consulting from 2002 to the present; is
18  that correct?
19      A.  That's correct.
20      Q.  And so let's look at that period between
21  1990 and 2002, and it is summarized on pages 4, 5,
22  6 and 7, correct?  It goes farther than that.

Case 3:12-cv-00889-WDS-SCW Document 132-3 Filed 10/02/13 Page 9 of 42
DEPOSITION OF CRAIG EVANS
CONDUCTED ON TUESDAY, APRIL 23, 2013

3 (Pages 9 to 12)

**9**

1    A.  It goes farther than that.

2    Q.  8 and seems to stop on the top of page 9,

3  correct?

4    A.  Top of page 10.

5    Q.  I was actually looking at the post college

6  graduation.

7    A.  Post college.  Okay.

8    Q.  And so if we just go from 1990 forward, it

9  goes from the top of page 10, if we go backwards,

10  going all the way back to page 4, correct?

11    A.  That's correct.

12    Q.  And in that period of time between 1990

13  and 2002 before you kind of opened your own shop,

14  what was the longest that you were at any position?

15    A.  Probably Koyo.

16    Q.  And how long were you at Koyo?

17    A.  If memory serves, it was about two and a

18  half years.

19    Q.  And give me the Reader's Digest summary of

20  what you did at Koyo.

21    A.  Koyo was a manufacturing engineer.  My job

22  was to participate and oversee in manufacturing

**10**

1  operations dealing with quality control, dealing

2  with machine modification, tool design and so

3  forth.  I also had the responsibilities of

4  installing new production lines and their varying

5  processes.  I actually went to Japan back in, I

6  think, 1996 or '97, or whatever it was.  I can't

7  remember the exact year.  But I was tasked to go to

8  Japan for about four weeks to participate in the

9  PPACs and PSWs, and then they shipped the machines

10  over to the States and I put them in.

11    Q.  And what is the business of Koyo?  What do

12  they make at the location that you were working at?

13    A.  Automotive wheel bearings and water pump

14  bearings at that particular time.

15    Q.  And so your primary emphasis was quality

16  control?

17    A.  Both quality control and manufacturing and

18  process engineering.

19    Q.  Okay.  So quality control is to make sure

20  that the ball bearings and other things that are

21  manufactured meet a certain standard?

22    A.  That's correct, by part of the print, part

**11**

1  of the drawings.

2    Q.  And the second part of your job would be

3  process modification?

4    A.  Well, process and manufacturing

5  engineering.

6    Q.  And tell me what processes you managed

7  there.

8    A.  If memory serves, there was three or four

9  bearing lines in one facility and at least a number

10  in another facility.  I worked at one facility for

11  a time and was transferred to another facility and

12  worked there for a time, and there were a number of

13  lines that I was responsible for.

14    Q.  And being responsible for, what did you do

15  for them?

16    A.  Kept the lines running.  I was very

17  hands-on, had a toolbox.  If a line would go down

18  for some reason or a machine would stop working, my

19  job was to assist the employees to get that line up

20  and running.

21    Q.  There were technicians that were working

22  under you.  But when there was a problem, you would

**12**

1  be hands-on and you would also assist?

2    A.  That's correct.

3    Q.  And with regard to this particular work,

4  you did that for about two years?

5    A.  Two and a half years.

6    Q.  All right.  And the lines that we're

7  talking about, they're in a plant or a factory?

8    A.  That's correct.

9    Q.  And how long is the line, a mile, a

10  hundred feet?

11    A.  They would be probably about 100 feet

12  long.

13    Q.  Why did you leave Koyo?

14    A.  I got a better offer.  I got about a

15  $10,000 increase in salary and I moved to Alabama.

16    Q.  Are there any other jobs that you were at

17  for like two years or longer?

18    A.  No.  I think that's about the longest

19  engagement I had.

20    Q.  Why was it that you were moving around so

21  much for this 12-year period?

22    A.  Well, in the engineering world today, it's

Case 8:12-cv-00660-AW-DNR Document 84-32 Filed 04/23/13 Page 5 of 42
DEPOSITION OF WILLIE EVANS FILED UNDER SEAL Page 5 of 42
CONDUCTED ON TUESDAY, APRIL 23, 2013

4 (Pages 13 to 16)

---

**13**

1  not uncommon for engineers to move around because
2  of monetary reasons. Let me go back to my history
3  here. The first engagement that I had with B&W
4  Nuclear Technologies --
5     Q.  What page are you on?
6     A.  That's on page 8. Dick, can you hear us?
7     MR. PHILLIPS:  Yes.
8     THE WITNESS:  With B&W Nuclear
9  Technologies, I worked for them about seven
10  months. I was the new man on the totem pole or
11  the low man on the totem pole, rather, and the
12  company had just been purchased or was in the
13  process of being purchased by a company called
14  Framitome out of France. And within a
15  relatively short period of time, they started
16  laying off people.
17     And in addition to that, I was in a
18  position to where I was the only engineer in my
19  department and it kind of tended to rub some
20  people the wrong way. Everybody else were
21  layman machinists that had been put into a
22  design capacity. And one guy didn't like it

**14**

1  and it just put me into a very awkward
2  situation.
3     When they started laying off people and my
4  supervisor, the engineering manager of that
5  department, once he was displaced to move off
6  somewhere else and eventually he lost his job,
7  then the gentleman that was sort of a leader of
8  the designers went to the plant manager and
9  told him a bunch of stuff. And next thing I
10  know, I was out the door.
11  BY MR. FOLEY:
12     Q.  So that was just in the very beginning?
13     A.  At the very beginning. That's right.
14     Q.  And then you had three temporary contract
15  positions, two as a draftsman and one as a
16  mechanical engineer?
17     A.  That's correct.
18     Q.  All of them were very short-lived,
19  correct?
20     A.  That's correct.
21     Q.  Then we go forward to the almost five
22  months that you were at DMI Industrial. Why did

**15**

1  you leave that?
2     A.  DMI Industrial.
3     Q.  DML.
4     A.  Yeah, DML Industrial, located in Hickory.
5  I was there for about six months and low and behold
6  they eliminated a third shift, started laying off
7  office personnel. So I saw the writing on the wall
8  and I retained the services of a headhunter or an
9  executive recruiter and got out of there. Within
10  two months or so, they had closed that plant.
11     Q.  So it was just a business that wasn't
12  doing well?
13     A.  That's right.
14     Q.  And then Copeland, why did you leave
15  there?
16     A.  Copeland. I got married or was engaged to
17  be married, and we looked and looked to try to find
18  my wife a job and there was nothing in the
19  Huntsville, Alabama area. So I decided to resign
20  my position there and come back to try to find I
21  had much better job opportunities along with her.
22     Q.  So you wanted to relocate back to North

**16**

1  Carolina?
2     A.  That's correct.
3     Q.  And why did you leave GKN Automotive?
4     A.  GKN Automotive was a good job. I really
5  enjoyed working there but they had a lot of
6  turnover in their supervisory staff. The company
7  moved them around a lot and no manager was there
8  normally over two years. And there was a new set
9  of managers that had come in and made some
10  decisions that put the engineers into really a
11  no-win situation, so I resigned. And shortly after
12  that, about 30 or 40 people quit.
13     Q.  Same deal?
14     A.  Same deal.
15     Q.  A company that was being poorly managed?
16     A.  That's exactly right.
17     Q.  And then you were at Erico for almost a
18  year and a half. Why did you leave there?
19     A.  I was driving two hours one way from here
20  to Pinehurst or, actually, Aberdeen is on the east
21  side of Pinehurst.
22     Q.  So it was just a bad geographic fit?

**17**

1    A.  That's right.
2    Q.  I don't mean to cut you off.  I just want
3 to get to the point on this background stuff.
4    A.  I understand.
5    Q.  And then you did almost a year at
6 Spherion.  Why did you leave there?
7    A.  That was a contract position and the
8 contract ended.
9    Q.  And it looks like you had a year and four
10 months at K&S Tool?
11    A.  K&S Tool and Manufacturing, that's
12 correct.
13    Q.  And it seems like that was wedged in the
14 middle of Gary E. Kilpatrick and Associates, the
15 forensic work that you started and were about to
16 ask, and you took a little sabbatical from it and
17 went back to work for a year.  What was happening
18 there?
19    A.  Well, I needed to raise capital funds for
20 my business.  And once I achieved that, I left this
21 business and went back to work for myself full
22 time.

**18**

1    Q.  So you went out on your own for about two
2 to three years, decided that you needed more cash
3 to put in to be self-employed and successful, went
4 and earned it for a year and a half, resigned and
5 went back to what you want to do now?
6    A.  That's correct.
7    Q.  Is that a fair summary there?
8    A.  Yes.
9    Q.  And since June of 2002 to the present,
10 with the exception of the K&S sabbatical, you have
11 been self-employed, correct?
12    A.  That's correct.
13    Q.  And it's Gary E. Kilpatrick and
14 Associates, P.A.?
15    A.  That's correct.
16    Q.  Who are the associates?
17    A.  I do not have any employees that work for
18 me personally.  So I consider my associates to be,
19 you know, my clients, other engineers that work
20 with me on projects and so forth.
21    Q.  So there's no one in-house that's doing
22 the work for you or with you.  When you refer to

**19**

1 associates, it's people who hire you or people that
2 you're consulting with who are also engineers?
3    A.  That's correct.
4    Q.  And the people that you are consulting
5 with, they have their own business or company that
6 they're working for?  They're not working under
7 your rubric, correct?
8    A.  That's correct.
9    Q.  And you're a P.A.  Who is the owner of the
10 company?
11    A.  Me.
12    Q.  Is there anyone else?
13    A.  No.
14    Q.  And anybody else who provides any support
15 staff on a routine or regular basis to Gary E.
16 Kilpatrick and Associates, P.A.?
17    A.  My wife is actually set up on the
18 constitution and bylaw documents of the corporation
19 as the Vice President and Secretary.  And so she,
20 you know, from time to time does some paperwork for
21 me.  Normally the corporate minutes or corporate
22 meetings, the yearly corporate meetings, and that's

**20**

1 pretty much it.
2    Q.  And basically you have to have a second
3 person, and you needed an individual and your wife
4 fulfills what that role is within the law, right?
5    A.  That's correct.
6    Q.  So she doesn't provide any substantive
7 engineering assistance to you in any of your
8 projects, correct?
9    A.  That's correct.
10    Q.  And she's not an engineer by trade?
11    A.  That's correct.
12    Q.  Tell me a little bit about the breadth of
13 Gary E. Kilpatrick and Associates.  I would like a
14 shorter word for that when we're talking about your
15 business.  Can I just call it the P.A.?
16    A.  That's fine.
17    Q.  How many cases does the P.A. review in a
18 given year?
19    A.  I would say at least a dozen, maybe more.
20 As time has progressed, I have been contacted more
21 and more to do more and more work.
22    Q.  So if we were back in 2002 beginning, less

Case 8:12-cv-00886-JVS-JPR Document 91-32 Filed 12/23/13 Page 27 of 42
DEPOSITION OF GARY EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

6 (Pages 21 to 24)

**21**

1    cases. 2013, approximately one a month you're
2    getting in terms of a case?
3        A. On average probably.
4        Q. And are all the requests for engineering,
5    forensic engineering, cases in litigation or
6    contemplated litigation?
7        A. Yes.
8        Q. And are 90 percent or more of the referral
9    parties lawyers?
10       A. Yes.
11       Q. And have you done any survey that tries to
12   divvy up what percent is on behalf of a plaintiff,
13   someone suing versus a defendant?
14       A. Yes. I have done that in the past. Based
15   on my statistical analysis, about 80 percent is
16   plaintiff, and this is civil. 80 percent plaintiff
17   and about 20 percent defendant, but I also do
18   criminal work and insurance work as well.
19       Q. And let's break down your three categories
20   by percentage. Civil represents in terms of income
21   what percent?
22       A. I would say probably 90 percent maybe.

**22**

1        Q. So a lion's share?
2        A. Yes.
3        Q. In criminal do you even charge for that?
4        A. Oh, yes.
5        Q. And who is hiring you, a defense attorney
6    or the State?
7        A. In regards to criminal? It would be the
8    State. It's the -- what do you call them?
9        Q. Commonwealth attorney or down here State's
10   attorney?
11       A. It's The assigned attorneys assigned to
12   criminals that are incarcerated.
13       Q. Like an Assistant Public Defender?
14       A. Public Defender. That's the term.
15       Q. If we were to look at, let's say, 2012,
16   last year, how many criminal cases did you do?
17       A. I would have to go back but I think either
18   zero or one.
19       Q. And the context that you're going to get a
20   criminal case is presumably a motor vehicle
21   manslaughter type setting?
22       A. That's correct.

**23**

1        Q. And you're looking at a motor vehicle
2    accident and seeing if there's evidence under the
3    statute that the defendant has committed whatever
4    the standard is, gross negligence?
5        A. That's correct.
6        Q. And that would be five percent or less of
7    your income?
8        A. Yes.
9        Q. And then the last little niche is
10   insurance?
11       A. Yes.
12       Q. And explain to me what context insurers
13   are retaining you.
14       A. Mainly vehicle inspections. I have been
15   retained to do a review of a traffic accident.
16   Never went to the site to do it. Actually, I did
17   go to a site on one just to collect the data
18   several years ago. They wanted me to collect the
19   data just in case something happened. Nothing
20   happened, so that was it. Mainly vehicle
21   inspections and traffic accident reconstruction
22   here and there but it's few and far between.

**24**

1        Q. And vehicle inspections; there's an
2    accident involving their insured's vehicle. They
3    want you to go look at it for what purpose? Not to
4    appraise the property damage but to understand the
5    underlying accident?
6        A. That's correct.
7        Q. And do you usually prepare a report when
8    you're dealing with these insurance companies or is
9    that just done more informally than that?
10       A. With the insurance companies, a report is
11   prepared. That's their requirement.
12       Q. And that would be the last five percent or
13   so of your income?
14       A. Yes.
15       Q. So the lion's share is coming from this
16   civil litigation?
17       A. That's correct.
18       Q. What do you do to market yourself so that
19   the attorneys are aware of your existence and
20   whether we're in Upper Marlboro or Easton, we know
21   to call Gary Kilpatrick?
22       A. That would be my website, of course. I am

CASE 8:12-cv-00968-VMC-CPT Document 123-3 Filed 01/04/13 Page 3 of 42
DEPOSITION OF GARY EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

7 (Pages 25 to 28)

**25**

1  set up with expert directories, JurisPro,
2  ExpertPages, experts.com, I think LexVisio, and I
3  think those are the only ones right off the top of
4  my head.
5      Q.  And so your own website is something you
6  put up for the P.A. and the other services are,
7  let's say, a third-party expert directory where
8  they're trying to market themselves to all the
9  lawyers and they get, no detriment, a stable of
10  experts in various regions and in various
11  specialties and they say we can refer Mr. Foley
12  this expert, correct?
13      A.  That's correct.
14      Q.  Do you have to pay a fee for those people?
15      A.  A yearly fee just to be listed.
16      Q.  And you have three or four of those?
17      A.  Yes.
18      Q.  Do you do anything in terms of trying to
19  reach out to bar associations or groups of lawyers
20  directly to market yourself?
21      A.  Not really, no.
22      Q.  Is there any reason that you're aware of

**26**

1  that the split of your work is 80/20 in favor of
2  the plaintiff?
3      A.  No.  Just depends on who calls.
4      Q.  Kind of word of mouth, and right now more
5  of your business is coming from the plaintiff side?
6      A.  That's correct.
7      Q.  Within this broad category that we're
8  calling civil forensic consulting, I have looked at
9  your website so I get a sense of the breadth of the
10  type of work that you're going to do but I would
11  like kind of the same type of a breakdown.  You
12  seem to do some accident reconstructions, correct?
13      A.  That's correct.
14      Q.  And if we do that broadly to include maybe
15  a products claim about a vehicle as well so it
16  could be that you're figuring out how the accident
17  happened or you're figuring out if the vehicle was
18  designed correctly.  What percentage of your civil
19  work is that?
20      A.  I would say -- just as an educated guess
21  without having to go through?
22      Q.  Yes, sir.

**27**

1      A.  I would say probably about 60 percent to
2  70 percent would be product defect and failure and
3  the rest would is accident reconstruction.
4      Q.  So the 30 to 40 percent is accident
5  reconstruction; 60 to 70 percent is product defect?
6      A.  That's correct.
7      Q.  And when we're talking about product
8  defect, it's such a broad area, I'm trying to break
9  it down even more.  How many product cases do you
10  think you reviewed in 2012 last year?  Five or six?
11      A.  I would say at least -- I gave you a copy
12  of my case work history, and all that information
13  will be in there.
14      Q.  Let's mark it, then, and make sure that I
15  have the right document.
16      A.  It is that one right there.
17      (Deposition Exhibit No. 2 was marked for
18  identification purposes.)
19      MR. FOLEY:  We're marking, Dick, something
20  as Exhibit 2 that is a document that you may
21  not have that he gave me and I'll certainly
22  provide it when I go back to Maryland.

**28**

1      MR. PHILLIPS:  Thank you.  That's fine.
2  BY MR. FOLEY:
3      Q.  This is entitled, "Gary Kilpatrick and
4  Associates, P.A., Forensic Engineering Case Work
5  History."  And this is all the cases that you
6  reviewed that are civil litigation?
7      A.  Everything.  Criminal, insurance,
8  everything.
9      Q.  And is it done alphabetically or how are
10  they organized?
11      A.  They are organized by the time that they
12  call in.
13      Q.  And so it starts in 2002 and goes all the
14  way up to the present?
15      A.  That's correct.
16      Q.  I'm trying to find 2012.  Showing you
17  what's page 32, the one on the bottom of page 31
18  seemed to be a 2011.
19      A.  Those are when the contracts were signed.
20      Q.  Okay.  When was that first call -- that's
21  even better.  So on the top of page 32 would
22  represent the first case that you might have done

29

1 in 2012, correct?
2    A.  That's correct.  That's a deposition.  I'm
3 sorry.  Yes.  It'll say "contract signed"
4 somewhere.
5    Q.  I think it's undated but I figured this
6 one was 2012.
7    A.  I guess I must have forgot to put the date
8 in there but I believe this was in 2012, too.
9    Q.  That's what I was assuming because the
10 other was so late.
11    A.  Yeah.
12    Q.  So the last, let's say, about six pages
13 before we get to service engagement history would
14 represent cases that you did in 2012 and 2013?
15    A.  That's correct.
16    Q.  And would you just go through very briefly
17 with those cases and identify what the subject is
18 of those reviews.
19    A.  Okay.
20    Q.  And you don't have to do anything other
21 than the name and the subject so we can move along.
22    A.  Okay.  Case number 87, it's law offices of

30

1 Scott L. Astrin.  I was retained to review
2 materials and do an investigation on a Big Dog
3 motorcycle.
4    Q.  So a motorcycle?
5    A.  Motorcycle, correct.
6    Q.  And then the next case?
7    A.  The next case was Battle & Vaught, P.A.
8 This was the review of an onboard camera video for
9 an attorney and I gave him an opinion.  That was
10 it.  Last I heard of it.
11    Q.  And what were you reviewing an onboard
12 camera video for?  Was there an accident?
13    A.  Yes, there was an accident.
14    Q.  So it was a form of an accident
15 investigation looking just at the onboard camera
16 video?
17    A.  That's correct.
18    Q.  Okay.  The next one?
19    A.  The next one would be case 89, Wright
20 Worley Pope Ekster & Moss, PLLC.  This case
21 involved an industrial accident dealing with a
22 Werner ladder.

31

1    Q.  And tell me a little bit about the ladder
2 case.
3    A.  It was a products defect analysis for a
4 product liability case, and my opinion was contrary
5 to her position and the case went away.  They
6 nonsuited the case.
7    Q.  And you were saying that the ladder didn't
8 have a defect and they gave up on it?
9    A.  It wasn't so much of a defect as it
10 appeared to have been damaged deliberately by
11 someone trying to file a frivolous lawsuit.
12    Q.  Okay.
13    A.  The next one, case 90, is Crumley Roberts,
14 LLP.  This had to do with a Skyjack 300 scissor
15 lift which actually failed in service and caused
16 somebody to fall.  It was a product defect and
17 failure.
18    Q.  So it was a scissor lift, and what
19 happened to the scissor lift to cause it to fail?
20    A.  Some of the support members, there was two
21 support members that actually fractured and the
22 thing actually rolled over and threw somebody out.

32

1    Q.  Okay.  Go to the next one, please.
2    A.  Okay.  Case 91, Benson Brown & Faucher,
3 F-a-u-c-h-e-r, PLLC.  This is a case dealing with a
4 traffic accident reconstruction, but my role in it
5 was to do a lamp filament analysis.  That is an
6 ongoing case right now.
7    Q.  Okay.  The next one?
8    A.  Next one, number 92, National Forensic
9 Consultants.  This right here is an insurance
10 claim, insurance company case.  My task was to
11 perform or give an opinion, so to speak, in regards
12 to a traffic accident and reconstruction dealing
13 with a Chevy Blazer and a Ford Crown Victoria.
14    Q.  Next one?
15    A.  Next one, number 93, Law Offices of W.
16 James Chandler.  This case had to do with an
17 escalator in a mall in Charlotte, and my opinion
18 was essentially contrary to his position and the
19 case either settled or went away.
20    Q.  Next case?
21    A.  Case number 94, Gardner Willis Sweat &
22 Handelman, LLP.  This case dealt with a motorcycle,

Case 8:12-cv-00568-WGC Document 132 Filed 10/02/13 Page 10 of 42
DEPOSITION OF GARY EVANS KIRKHAM, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

9 (Pages 33 to 36)

| 33 | |
|---|---|

1    a dirt bike called a QG-214S Coolster, and I
2    reviewed some documentation and gave the client
3    some information, some sort of opinion, and that's
4    the last I heard.  The case evidently settled.
5       Q.  It was an accident on a dirt bike, though?
6       A.  It was an accident but it was a products
7    liability case.
8       Q.  Okay.
9       A.  The next case is 95, Sparrow Wolf &
10    Dennis.  We just actually wrapped this case up.
11    This was a full-blown traffic accident
12    reconstruction, and I submitted a report in this
13    particular case and my client was able to settle
14    this case out of court.
15       Q.  All right.
16       A.  Next case, number 96, Savage Turner
17    Pinckney & Madison.  This dealt with a Kawasaki
18    motorcycle.  There was a product defect and failure
19    analysis of a ZX600-RBF and it dealt with a faulty
20    voltage regulator.  And that case is ongoing right
21    now.
22       Q.  Okay.

| 34 | |
|---|---|

1       A.  Next case, number 97, Mike Lewis
2    Attorneys, which is a local attorney in Winston.
3    It's about a half hour from here.  He retained me
4    to do a traffic accident reconstruction, and my
5    opinion was contrary to his position and the case
6    went away.  He didn't even take the case.
7       Q.  Okay.
8       A.  Okay.  Next case 98, Law Offices of F.
9    Bryan Brice.  It was an industrial accident
10    investigation dealing with a flatbed trailer and a
11    forklift.  And if memory serves, I think I
12    submitted a report in there, which is not dated and
13    it's not documented here.  The case settled.
14       Q.  What were you looking at?
15       A.  It was a case dealing with loading a
16    tractor-trailer with a forklift.  There was a
17    demolition site and the forklift driver made some
18    errors and did not operate the forklift properly
19    and actually almost killed a guy.
20       Q.  So you were critical of the way in which
21    the forklift operator was operating the forklift?
22       A.  That's correct.

| 35 | |
|---|---|

1       Q.  Okay.
2       A.  Next case, number 99, Thurmond Kirchner
3    Timbes & Yelverton.  This is a current case and I'm
4    going to be testifying in trial early next month.
5    This is an ATV accident investigation.
6       Q.  All-terrain vehicle?
7       A.  All-terrain vehicle.
8       Q.  Is it a products claim that you're looking
9    at there or something else?
10       A.  No.  This is more of a --
11       Q.  How it happened?
12       A.  Yeah.  It's how it happened and I'm going
13    to be testifying as to the safety of the ATV and
14    what type of machines they are and so forth.
15       Q.  Fair enough.
16       A.  The next case, 100, Douglas Jennings Law
17    Firm.  This case involves a tractor-trailer/car
18    accident investigation and it's here in North
19    Carolina.  The gist of the case is that a gentleman
20    parked a tractor-trailer at an industrial site on a
21    set of scales and a driver in a car came around and
22    hit him, run over him.  And so that case is

| 36 | |
|---|---|

1    ongoing.
2       Next case, 101, Amos & Kapral.  This
3    particular case has just settled.  As a matter of
4    fact, I got an e-mail it settled today.
5       MR. FOLEY:  For the record, he's checking
6    the iPhone to show me the e-mail.  I thought he
7    had a message, Dick.
8    BY MR. FOLEY:
9       Q.  What type of case?
10       A.  It's an industrial accident
11    reconstruction.  And right off the top of my head,
12    I can't remember what it was but the case has just
13    settled.
14       Q.  Okay.
15       A.  Next case is 102, Hendrickson & Long.
16    This is an industrial accident investigation and
17    this case is in West Virginia.  I just got this
18    case.  It just came in.  I have not started working
19    on it yet but it's an industrial accident case.
20       Q.  Okay.
21       A.  Case number 103, Shapiro Lewis Appleton &
22    Favaloro, F-a-v-a-l-o-r-o, PC.  This is a Virginia

**37**

1  case. This is a motorcycle accident
2  reconstruction. I've just started it and haven't
3  gotten into it yet.
4      Q. All right.
5      A. And, of course, 104 is the case which
6  we're here today for, the Phillips Law Firm.
7      Q. That's the last one on the list?
8      A. That's correct.
9      Q. So we just went over a period of about 16
10 months and you had 18 cases, so your estimate was
11 pretty dead on.
12     A. Yeah.
13     Q. I also noticed of the cases 1, 2, 3, 4, 5,
14 6, 7, 8, 9, 10 involved either straight up accident
15 reconstruction or a products liability out of an
16 accident reconstruction. Does that seem typical
17 that half or a little bit more is going to be
18 accident reconstruction?
19     A. Throughout the years, there's been more
20 products liability cases than there's been accident
21 reconstruction as far as like traffic accident
22 reconstruction.

**38**

1      Q. And just so you're not confused with what
2  I did, if it was a motorcycle accident and you were
3  blaming the design of the motorcycle, I was still
4  putting that as a traffic accident. So that could
5  be counted either way, correct?
6      A. That's correct.
7      Q. I did not see any cases, save this one,
8  involving any utilities. You didn't review any
9  utility cases in the last year, correct?
10     A. That's correct.
11     Q. And have you reviewed utility cases in
12 your legal career?
13     A. No.
14     Q. Have you ever been involved in any of your
15 professional experience in any utility employment
16 setting?
17     A. No.
18     Q. Before you got to the forensic world, do
19 you have any professional experience involving
20 utility towers?
21     A. No.
22     Q. Do you have any regarding the transmission

**39**

1  of electricity before it gets to the end consumer?
2      A. No.
3      Q. Do you have any regarding the design of a
4  utility tower for high tension purposes?
5      A. No.
6      Q. Do you have any post forensic work cases
7  in which you have reviewed any issues involving
8  utility towers similar to this?
9      A. No.
10     Q. Do you have any cases where you've
11 reviewed the construction of high-rise steel towers
12 that you would call analogous to this?
13     A. No.
14     Q. Would you have any specialized knowledge
15 in the construction of these type of towers?
16     A. Yes.
17     Q. And what knowledge or knowledge base is
18 that?
19     A. I'll show you. These two.
20        MR. FOLEY: Dick, just so you're following
21 along, the witness has produced three looking
22 like textbooks. He's going to explain them to

**40**

1  me.
2         MR. PHILLIPS: Got it.
3         THE WITNESS: This book here is the Manual
4     of Steel Construction. Any engineer that deals
5     with structural steel has one in his office.
6     You can bank on it.
7  BY MR. FOLEY:
8      Q. Okay. And let's just get a title page or
9  something so I can identify what that is.
10     A. A title page?
11     Q. The name of the title, the author and the
12 edition just so I can have a reference. I'll give
13 an example. The first book that he handed me is
14 called Manual of Steel Construction. It is written
15 by the American Institute of Steel Construction,
16 Inc. This is the 7th Edition and this was copy
17 written in 1970 and '73, just so we have a
18 reference as to what we're talking about.
19     A. Okay.
20     Q. So this is a common textbook any
21 mechanical engineer would have?
22     A. Yes.

Case 6:12-cv-00986WGC Document 232 Filed 10/28/13 Page 12 of 42
DEPOSITION OF GARY EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

11 (Pages 41 to 44)

**41**

1    Q.  And this is the type of thing that you get
2  going through college?
3    A.  Well, not in college.  After college.
4    Q.  After college.
5    A.  There's another book that I want to
6  produce, too, that's called Machinery's Handbook.
7  Engineers also have these things because it's got
8  just a wealth of information in it.
9    Q.  And the Machinery's Handbook 25, which is
10  written by --
11    A.  Written by -- it's published by Industrial
12  Press but it's written by many, many people.
13    Q.  Is there a chief editor so we know who
14  we're dealing with?  Not really?
15    A.  Associate editor is Robert E. Green and
16  Christopher J. McCauley.
17    Q.  And the year and the edition?
18    A.  This thing was published in 1996.
19    Q.  Okay.  And I interrupted you.  Now that we
20  have identified this document, how would a
21  mechanical engineer such as yourself have access or
22  use the Machinery Handbook 25?

**42**

1    A.  Machinery Handbook has information dealing
2  with the material types, material chemistry, yield
3  strengths, ultimate strengths, and I refer to this
4  in my report, refer to that book in my report.  It
5  covers a wide, broad range of topics from strength
6  of materials, which is what this textbook is, along
7  with a whole host of other things.  Heat treat
8  methods, anything dealing with materials and
9  machine components, this right here to a machinist
10  and particularly an engineer is like a Bible is to
11  a preacher.
12    Q.  And these two first books that we've
13  identified by title and edition, is there anything
14  specific to utility tower design in these books?
15    A.  Not in --
16    Q.  You can't point.  You have to use the
17  name.
18    A.  The Manual of Steel Construction.  Any
19  engineer that would design these steel towers would
20  use information out of this book.
21    Q.  What I'm asking is:  Is that just a
22  general text that talks about steel construction or

**43**

1  am I going to find a specific chapter on doing
2  utility tower design?
3    A.  No.  It's just for the structural steel
4  itself and all the scientific data for that.
5    Q.  Okay.  And what about the Machinery
6  Handbook?
7    A.  The Machinery Handbook has a whole host of
8  topics.  It covers just about everything under the
9  sun.  And if you need to know something from a
10  material standpoint, material chemistry, yield
11  strengths, ultimate strengths, and that's also
12  covered in this book for structural steel members.
13    Q.  When you said "this book," you're
14  referring to the first one?
15    A.  Yeah, the Manual of Steel Construction.  I
16  mean it would be laborious to go through the Table
17  of Contents because it's pages and pages and pages
18  long and I know we don't want to do that today.
19    Q.  The question that sent me off on this, is
20  there anything specific in Machinery Handbook 25 to
21  utility tower design?
22    A.  There could be, yes.

**44**

1    Q.  Is there any specific section that you
2  relied on that discussed utility tower design?
3    A.  No, except for the ultimate strengths and
4  yield strengths and materials.
5    Q.  So you used it for the strength of -- and
6  when we're talking material, the material is steel?
7    A.  That's correct.
8    Q.  So you used it as a handbook to determine
9  the relative strength of the steel that you believe
10  was used to construct this tower?
11    A.  No.  I got a range of strengths because
12  right now based on what limited information I have
13  about the tower, I don't know what kind of material
14  it's made out of.  I know it's steel but we don't
15  know what type.  So I just gave a range of what it
16  could be.
17    Q.  Meaning there's more than one type of
18  steel and you don't have specifics.  So you said
19  could be this strength or could be that strength,
20  correct?
21    A.  That's correct.
22    Q.  The third textbook that you have in front

Case 8:12-cv-00068-WGC Document 83-2 Filed 10/02/14 Page 13 of 42
DEPOSITION OF GARY EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

12 (Pages 45 to 48)

**45**

1  of me, what is the title, first of all?
2     A.  It is called McGraw-Hill Series in
3  Mechanical Engineering. Look on the spine, it's
4  Mechanical Engineering Design and it covers --
5     Q.  And who is the author and the year and
6  edition?
7     A.  This is the 4th Edition. It was written
8  by a gentleman by the name of Joseph Shigley and
9  there's another gentleman by the name of Mitchell
10 and I can't remember his name off the top of my
11 head. This book was written -- this particular
12 edition was released in 1983, and it's considered
13 in my opinion to be one of the great textbooks of
14 its day. Joseph Shigley was one of the first
15 college professors to write textbooks on machine
16 design.
17    Q.  And was that a college textbook for you?
18    A.  Yes, sir.
19    Q.  And what was the name of the class that
20 you took at NC State that was the text for?
21    A.  Machine design.
22    Q.  And what portion of the text did you rely

**46**

1  on for any opinions today regarding the utility
2  tower design?
3     A.  The von Mises stresses.
4     Q.  And the von Mises stresses we'll come to
5  again but that is trying to figure out what
6  additional force is added to this situation as a
7  result of twisting?
8     A.  No. The von Mises stresses are design
9  stresses. When you design and try to size a
10 member, you want to use the von Mises stresses to
11 do that. You do not want to use the bending stress
12 calculations. You don't want to use principal
13 stresses. You want to use the von Mises stresses.
14 Those are the most reliable.
15    Q.  Anything else you used that book for
16 regarding this case?
17    A.  Well, just the general knowledge of how to
18 do an analysis on a structural member.
19    Q.  And then the last book that you have?
20    A.  The last book I have is called Mechanics
21 and Materials, 4th Edition. This particular
22 edition was released in 1997. When I went to

**47**

1  college, I took this class. It was called
2  mechanics or strength and materials, and I used its
3  predecessor. It was earlier. It was either 2nd or
4  3rd Edition. This particular textbook here is one
5  of the classic textbooks. It's one of the best
6  textbooks I've ever read on the subject of strength
7  and materials and this is the subject matter in the
8  textbooks that we study as engineers that deals
9  with the design of beams, columns, torsional
10 members and so forth.
11    Q.  So this book also provides valuable
12 information to you regarding the strength of
13 materials?
14    A.  That's exactly right, yes.
15    Q.  And none of these four books are specific
16 to utility tower design, correct?
17    A.  Not specific to a utility tower but you
18 use the information in it to do the analysis on the
19 utility tower. And one thing I want to add is --
20 bear with me. There's a gentleman that's called --
21 the authors as it appears on the front is Gere and
22 Timoshenko. Stephen P. Timoshenko was a Russian

**48**

1  immigrant right after the Russian Revolution and he
2  invented the technology in this book. He's the
3  man.
4     Q.  So he's one of the leading writers of this
5  part of engineering?
6     A.  That's right. And James Gere, the actual
7  author of this book, took his original manuscripts
8  and created this textbook.
9     Q.  So basically you have the original book
10 that gets updated by a subsequent author?
11    A.  That's correct.
12    Q.  Any other bases? What started us off down
13 the textbook road, I was asking what specialized
14 knowledge or bases did you have as what I'm going
15 to call more of a forensic mechanical engineer that
16 would allow you to perform an analysis on a utility
17 tower design.
18    A.  Could you repeat that question? You kind
19 of lost me.
20    Q.  I wasn't trying to trick you. That was
21 just the predicate. So let me ask a question
22 cleanly. You provided those four textbooks and

Case 8:12-cv-00999-AW Document 31-2 Filed 04/24/13 Page 19 of 42
DEPOSITION OF GARY EVANS RIEDER, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

13 (Pages 49 to 52)

**49**

1 those were information that you relied on that you
2 say provided you assistance in doing the analysis
3 in this case, correct?
4    A.  That's correct.
5    Q.  And other than the materials that are
6 going to be marked and shared here that either were
7 provided by counsel or you produced, are there any
8 other materials or information that you relied in
9 doing your analysis?
10    A.  No.
11    Q.  Did you do any survey, for example, of
12 utility tower design in the United States?
13    A.  I purchased this particular book right
14 here by the National Electrical Code.  This
15 code outlines the basic information of how these
16 towers are supposed to be designed.
17    Q.  The National Electric
18 Safety Code.  Other than the National Electric
19 Safety Code you purchased just for this case, the
20 2007 version, correct?
21    A.  That's correct.  And that was the version
22 in force at the time this accident took place.

**50**

1    Q.  I didn't mean to suggest it was the wrong
2 one.  And that is something that would be kind of
3 more of a bible for an electrical engineer than a
4 mechanical engineer, correct?
5    A.  Except for the structural part of it, yes.
6    Q.  Oh, I understand why you got it in this
7 case.  But if you're an electrical engineer, you
8 might already have that in your library, right?
9    A.  Yes.
10    Q.  And that's the difference.  And that NESC
11 code doesn't really try to be a building code
12 for a tower; it is focused from an electrical
13 engineering point of view on how to maintain
14 quality assurance in the transmission of electrical
15 services for utility and even for a consumer,
16 correct?
17    A.  That's correct.
18    Q.  Okay.  And it's written by electrical
19 engineers, I assume?
20    A.  I would assume it would be but the
21 mechanical part dealing with the tower design would
22 be written by either civils or mechanicals or both.

**51**

1    Q.  Do you have any independent basis for
2 knowing how utility towers are typically designed
3 in the industry before this case?  So if I were to
4 ask you what is the common design for utility
5 towers, before any of this litigation, did you have
6 that in your back pocket already?
7    A.  No.
8    Q.  And so you undertook as a mechanical
9 engineer, and a forensic one, to try to educate
10 yourself regarding this subject?
11    A.  That's correct.
12    Q.  And you've shown the resources that you've
13 relied on for that education, correct?
14    A.  That's correct.
15    Q.  And can you say, for example, in Maryland
16 that it is industry standard for utility towers in
17 these high tension settings such as this to be
18 designed with or without braces on the lateral
19 support arms a certain percentage of the time?
20    A.  Ask that one more time.
21    Q.  That's a lot.
22    A.  That's a big question.

**52**

1    Q.  So I'm going to just focus us on Maryland
2 because it's a Maryland case.  All right?
3    A.  Okay.
4    Q.  You weren't a Maryland engineer.  You
5 joined for this case, correct?
6    A.  That's correct.
7    Q.  And you have to pay a fee and then you
8 become a Maryland engineer, right?
9    A.  That's correct.
10    Q.  But if we just focus on Maryland, we're
11 talking about the subject of utility towers.  Okay?
12    A.  Yes.
13    Q.  And what is critical as I read your report
14 is the bracing system that you say is required for
15 lateral arms.  Okay?
16    A.  Yes.
17    Q.  And the question is:  Are you familiar in
18 the state of Maryland generally as to how utility
19 towers are typically designed with regard to this
20 bracing?
21    MR. PHILLIPS:  Let me interpose an
22 objection to the question.

**53**

1    MR. FOLEY: Okay. It wasn't the form; it
2 was just you didn't like the subject matter?
3 Because I'll clean it up if I went on too long,
4 Dick.
5    MR. PHILLIPS: No. All I'm saying is that
6 I'm not sure that there is a Maryland -- I
7 don't think this is like a medical malpractice
8 case where you're going to have a different
9 standard for Maryland than you would have for
10 the national. So I think it's an objectionable
11 question for that reason.
12    MR. FOLEY: Well, I'll ask Maryland and
13 I'll give him at the end a chance to talk about
14 any universe that he's comfortable in.
15    MR. PHILLIPS: I'll just have a continuing
16 objection on that basis.
17 BY MR. FOLEY:
18    Q. Do you need it repeated?
19    A. Yes.
20    Q. In Maryland looking at utility towers, do
21 you have any understanding as to what the industry
22 standard or norms are regarding the bracing of

**54**

1 these lateral arms, whether the utility towers
2 typically do or do not?
3    A. The only way that I can answer that
4 question is you have the safety code right here
5 that I've presented today, and the safety code
6 spells this stuff -- gives the general requirements
7 as to the types of loads these towers are supposed
8 to be able to support and so forth. And since it
9 is a national code, I can only assume that Maryland
10 has to abide by a national code. Not so much
11 Maryland. PEPCO is a private company and it just
12 happens to be in the power grid up there just like
13 Duke Power or TVA or any other power producer, and
14 they have to abide by the National Electrical Code
15 in order to build these towers.
16    Q. Restated, you're saying other than the
17 NESC, I don't have any basis for knowing how
18 they're designed in Maryland?
19    A. That's correct.
20    Q. Okay. And if we were to ask on a
21 percentage basis, if we were just to go look at
22 these large utility towers in Maryland, do you know

**55**

1 what percent of the towers are going to have the
2 arms braced in the fashion that you say are
3 required that were not done in this case?
4    MR. PHILLIPS: I have a continuing
5 objection, right?
6    MR. FOLEY: Absolutely. You tell me when
7 you're not objecting.
8    MR. PHILLIPS: Okay.
9    THE WITNESS: The way I would like to
10 answer that question is this: I've seen a lot
11 of these towers. Some have bracing and some
12 don't.
13 BY MR. FOLEY:
14    Q. Do you know what the factors are when they
15 are trying to decide whether to add bracing or not
16 to the towers?
17    A. In my professional opinion, if the power
18 producer, in this case PEPCO, or Duke or anybody
19 else for that matter, if they know that there is
20 going to be a subcontractor or even their own
21 people that's going to be up in this tower using
22 that middle arm to support the power line cable in

**56**

1 order to service it and change out the insulators
2 and so forth, that arm is going to have to be
3 designed in order to hold that load. Without the
4 proper bracing, you can't load it like this one was
5 loaded. Otherwise you're going to wind up in the
6 same situation. You're going to wind up with a
7 catastrophe.
8    Q. My question is: Do you know when the
9 utilities are designing the towers in what
10 instances there are braces on the arms and what
11 instances there's not?
12    A. In regards to the utilities and the
13 decisions they make, no.
14    Q. And when you're looking at a utility
15 design of a tower, what are the many factors that
16 they're looking at when they're trying to decide
17 how to build a tower?
18    A. Well, one is the loads that that tower has
19 to be able to support. The tower in question here
20 is supporting somewhere close to 20,000 pounds, and
21 that doesn't include the weight of the tower
22 itself. And when people have to get up inside to

57

1 work on it, it's going to have to be a safe
2 structure in order to do that.
3 Q. And the point is you say that based upon
4 your observation, many towers have braces and many
5 do not, correct?
6 A. I've seen more towers that have bracing
7 than the ones that don't.
8 Q. Did you know that more than 50 percent of
9 the towers in PEPCO's system are not braced? Did
10 you know that?
11 A. No.
12 Q. Did you know that 50 percent or more of
13 the towers in the BGE system are not braced?
14 A. No.
15 Q. Do you have any statistics to say what is
16 common in terms of a statistical variation of
17 braced versus unbraced towers?
18 A. No.
19 Q. And do you know the factors that the
20 engineers who are doing these electrical
21 transmission systems are looking at when they're
22 trying to decide whether to brace towers or not?

58

1 MR. PHILLIPS: Objection.
2 THE WITNESS: I would have to refer to the
3 National Electrical Code for their information.
4 That's where they're getting their information
5 from.
6 BY MR. FOLEY:
7 Q. Let's look at the National Electric Safety
8 Code.
9 A. Okay.
10 Q. Which section is going to be applicable to
11 this?
12 A. This would be part two.
13 Q. And you're on page --
14 A. This would be page 203.
15 Q. Is this a grade B and C construction?
16 A. I'm not sure.
17 Q. Is this section only applicable to grades
18 B and C construction?
19 A. Without going back to review it, I'm not
20 really sure.
21 Q. Are you familiar with the grades of
22 construction for utility towers?

59

1 A. No.
2 Q. And are you familiar that based on the
3 grade, there are different rules as to how the
4 tower is designed?
5 A. Right off the top of my head, no.
6 Q. Are you familiar that the National
7 Electric Safety Code only requires measurements at
8 the end point of these arms?
9 A. At the end points, yes.
10 Q. And the arms have specific requirements
11 that talk about how much load they must carry at
12 the end point, correct?
13 A. That's correct.
14 Q. And that's measured not just in terms of
15 vertical load, is it?
16 A. Lateral load, too.
17 Q. And when they call longitudinal load, what
18 are their referring to?
19 A. Longitudinal load would be -- well, you
20 have a vertical load and longitudinal would be
21 horizontal, as far as I know.
22 Q. Are you familiar that longitudinal load

60

1 only is triggered when you have a dead end and it's
2 the last tower on a line?
3 A. Yes.
4 Q. And why is that?
5 A. Why is what?
6 Q. Why is that the only time you would
7 measure longitudinal load?
8 A. Because the tower is loaded on one side
9 only.
10 Q. And when we talk transverse load, what is
11 that referring to?
12 A. That would be probably the vertical loads.
13 Q. Are you guessing or do you have a
14 certainty regarding these terms that the NESC is
15 using?
16 A. Right now I'm not real familiar with the
17 term that we're talking about.
18 Q. And these are terms that are right out of
19 the National Electric Safety Code, correct?
20 A. Yeah. You could point them out to me.
21 Q. I don't want to be the expert because I'm
22 going to flunk engineering. They sent me to law

**61**

1 school for a reason. I talk to engineers. They
2 ask me questions and I'm asking. With regard to
3 the measurement of the load, what does the NESC
4 require on a B and C construction situation as to
5 how much load a lateral arm has to carry at the end
6 point?
7    A. From what I understand -- I'm not familiar
8 with that part of the code. But from what I
9 understand from the OSHA report, those arms have to
10 be able to carry a 12,200-pound load vertically and
11 a 15,000, I think, 500-pound load laterally.
12    Q. And that OSHA report was simply quoting
13 PEPCO as to what the specifications for this tower
14 was, right?
15    A. That's correct.
16    Q. And you didn't perform an independent
17 calculation to determine what the load requirements
18 are for that tower, correct?
19    A. No.
20    Q. And as a matter of fact, the NESC has
21 specific formula that allows an engineer to figure
22 out what the load requirement is at the end points,

**62**

1 correct?
2    A. I'm not sure. I would have to actually go
3 review the code and see what it says.
4    Q. Well, if you review the code, does it talk
5 about a measurement of the arm as to the weight of
6 the arm, the weight of the transmission wire that
7 it is carrying, a certain factor for it to be
8 covered in ice and snow and then a certain fudge
9 factor on top of that?
10    A. Yes.
11    Q. What is the multiplier that is used in a B
12 and C construction in the Maryland geographic
13 region for the weight of the wire covered with ice
14 plus the arm when you're talking about a tolerance?
15    A. I think it's double. I think there's a
16 safety factor of two.
17    Q. Would the code lay out an actual specific
18 number in here?
19    A. Probably.
20    Q. See if you can find it because I don't
21 know that I see double.
22    A. It'll take me a while.

**63**

1    Q. But your best estimate is that it would be
2 double?
3    A. Just right off the top of my head, I would
4 say yes, but I'm sure it's going to be different
5 than that. I don't know.
6    Q. All right. And these are not measurements
7 or applications that you had ever used before this
8 case, fair?
9    A. That's correct.
10    Q. And so what you were doing was looking at
11 the National Electric Safety Code and trying to
12 apply their code to this design, correct?
13    A. Run that by me one more time. I was a
14 little bit distracted there.
15    Q. I didn't mean to talk at the same time.
16 What you are trying to do is look at the National
17 Electric Safety Code and apply their formulas to
18 this design?
19    A. No. Now, the formulas I applied, the work
20 that I did I took out of the engineering textbooks
21 and the engineering sciences, not what the code
22 says. I could be wrong but I'm not sure -- I don't

**64**

1 think the code actually tells the power producer
2 the specifics of exactly how to design these
3 towers. All they do is give general requirements
4 of the loads and what the load requirements are,
5 and then it's up to the power producer to design
6 the towers to meet those criteria.
7    Q. And there are very common and reproduced
8 tower designs throughout the country as each
9 utility looks at the other utility and tries to
10 come up with the most efficient, strong, stable way
11 to do this, correct?
12    A. I can only assume so but I don't know.
13    Q. Then you don't know; is that fair?
14    A. For that question, yes.
15    Q. And you don't really have a knowledge of
16 the utility tower design industry to be able to
17 compare the PEPCO tower to the typical towers in
18 California, New York, North Carolina to say they're
19 the same or different?
20    A. No.
21    MR. PHILLIPS: Objection. I don't think
22 that that's a relevant question.

65

BY MR. FOLEY:

Q.   The tower that was designed, it met the formula required by the NESC for the strength of the tower at the end regarding any longitudinal strength; is that correct?

A.   I can only assume so.  But just keep in mind that according to this code, and I'll read it, it says, "Crossarm shall be supported by bracing if necessary to support the 'expected loads' including line personnel working on them.  Crossarm braces used only to sustain unbalanced vertical loads need only be designed for these unbalanced vertical loads."

So what that's saying is if any personnel is up inside this tower working, there has to be the appropriate bracing in the arms to support the loads that they're going to be applying to it.

Q.   I will get there.  My question was a lot different than that.

A.   Okay.

Q.   My question was:  Did this arm that's the subject of this case, if it's the middle arm, did

66

it meet the NESC requirement for longitudinal strength?  I took your answer before we had our detour as you assumed so, you didn't do an independent calculation, correct?

A.   That's correct.  It's just -- I can only assume that it meets their criteria, meets the code.

Q.   And with regard to the vertical forces that would come down on it, did the end of the arm meet the NESC regarding that parameter?

A.   Only at the end.

Q.   Are there any other types of forces that a tower has to plan for?  For example, wind, weather, any reaction to other towers and other changes in the tension of wires?

A.   Yes, including icing.

Q.   Right.  Do you have any reason to believe that this tower design did not meet NESC requirements regarding all those type of conditions?

A.   No.

Q.   Now, you had a section that you pointed

67

out to me and it's on page 203 in construction B, C talking about bracing that says, "Crossarms shall be supported by bracing, if necessary, to support expected loads, including line personnel working on them."  Is that the section that you're referring to?

A.   Yes.  And it's also stated on page 109. It essentially repeats it.

Q.   I think you said 109.  I think you might mean 209.

A.   209.  It says, "Crossarm shall be securely supported by bracing, if necessary, to withstand expected loads, including line personnel working on them."

Q.   Is this a grade N construction tower?

A.   It's grade N construction, yes.

Q.   And is this tower they were dealing with grade N?

A.   That I don't know.

Q.   So do you know if page 209 is applicable?

MR. PHILLIPS:  Can you give me a section number because I'm looking at a previous

68

National Electrical Code.

MR. FOLEY:  Yeah.  263(e).

MR. PHILLIPS:  Which is it now?  Say it again.

MR. FOLEY:  263(c).

MR. PHILLIPS:  Okay.  Thank you.

MR. FOLEY:  Sure.  And I'll give you a copy of the pages that he's talking about out of the 2007.

MR. PHILLIPS:  I'm looking at the 1997 book.  That gives you an idea of how often I do this.

MR. FOLEY:  Are you with us now?

MR. PHILLIPS:  Well, not exactly.  Perhaps if we could find the conversion table where they tell you the old sections.  I'll deal with it.  Go ahead.

BY MR. FOLEY:

Q.   And I said do you know if construction grade N is applicable to this case?

A.   Right off the top of my head, no.

Q.   Now, going back to the bracing, it talks

**69**

1  about a workman being on top of the arm. Do you
2  have an opinion in this case if it was merely a
3  workman on top of the arm, that the arm as designed
4  would not have been able to handle the additional
5  force of a workman on that line?
6  **A. No. It should be able to withstand just**
7  **the weight of a person.**
8  Q. Right. And you don't have an opinion to a
9  reasonable degree of certainty that this one
10  wouldn't have held a person, and to the contrary it
11  probably would have, correct?
12  **A. Absolutely, yeah.**
13  Q. And do you have any knowledge of C. W.
14  Wright --
15  I need a break. I just need a little
16  water.
17  (Recess taken.)
18  MR. FOLEY: We're back on the record. We
19  wanted to let the record show Ms. Lister is
20  actually participating via telephone at that
21  end and we hadn't listed her as also present.
22  MR. PHILLIPS: Thank you.

**70**

1  BY MR. FOLEY:
2  Q. When we broke, I was asking about your
3  familiarity with the company C. W. Wright. Do you
4  have any understanding before this case as to C. W.
5  Wright?
6  **A. Before the case, no.**
7  Q. And what is your understanding of C. W.
8  Wright's role in terms of where it fits in the
9  electrical utility industry?
10  **A. From what my client has told me, C. W.**
11  **Wright is a subcontractor that services the power**
12  **line towers for different power producers.**
13  Q. And it is a utility tower transmission
14  line construction company and maintenance company;
15  is that your understanding?
16  **A. As far as I know, yes.**
17  Q. And it works throughout the Delaware,
18  Maryland and Virginia region for multiple utilities
19  and it has a specialized knowledge, and that
20  knowledge is designing -- I mean of building and
21  maintaining utility towers. Were you aware of
22  that?

**71**

1  MR. PHILLIPS: Objection. Go ahead.
2  THE WITNESS: I can only assume that
3  you're representing it to me.
4  BY MR. FOLEY:
5  Q. Were you aware of that?
6  **A. Only to the point that the documentation**
7  **that I read indicated so.**
8  Q. Did you review any of like the contract
9  documents that laid out that C. W. Wright was the
10  company with specialized knowledge as to how to
11  carry out this particular job, the insulator
12  replacement work?
13  **A. I read through the contracts, yes.**
14  Q. And did you see where it indicated that
15  C. W. Wright solely was the party that was going
16  to, because of its knowledge of this particular
17  part of the industry, come up with the means and
18  method to be able to affect these jobs?
19  **A. I read through it and based on the general**
20  **text of the contract, it was worded like that. But**
21  **in my opinion that does not take away the**
22  **responsibility of PEPCO to have structures that are**

**72**

1  safe for linesmen to work in.
2  Q. Well, the question really more is: What
3  did C. W. Wright agree to do? And would it be a
4  fair statement that they agreed to use appropriate
5  and safe means to be able to affect these insulator
6  replacement work?
7  **A. Yes.**
8  MR. PHILLIPS: Objection. I would say
9  their contracts speak for themselves but that
10  doesn't necessarily impact the opinions that
11  he's going to give.
12  BY MR. FOLEY:
13  Q. You can answer, sir.
14  THE WITNESS: Ask that one more time.
15  BY MR. FOLEY:
16  Q. I said did C. W. Wright agree to provide
17  the safe and effective means to do the insulator
18  replacement work that is the subject of this
19  contract?
20  **A. Yes. But PEPCO was familiar and had**
21  **copies of their documentation with their procedures**
22  **in-house because that has to be provided. I can**

---

**73**

1    only assume it would have to be provided so that
2    PEPCO can review their contract, review their
3    procedures and make sure that they are a credible
4    company that knows what they're doing. So PEPCO
5    knew their procedures and knew their work methods
6    and so forth.
7        Q. Do you know if C. W. Wright has been doing
8    this type of work on PEPCO and BG&E towers for
9    years?
10       A. Right off the top of my head, no.
11       Q. Do you know if they are the ones who
12   actually constructed the tower in question?
13       A. From what I understand they do not
14   construct towers. They simply maintain them.
15       Q. What is the basis of that information?
16       A. From what my client tells me.
17       Q. And the client in this case is not a
18   party, and that is what Mr. Phillips is telling
19   you?
20       A. Yeah. It's what Mr. Phillips is telling
21   me, correct.
22       Q. So the information you had from

---

**74**

1    Mr. Phillips was that C. W. Wright is only involved
2    in the maintenance work?
3        A. Yes.
4        Q. And not the construction?
5        A. Yes.
6        Q. Is that important for your opinions?
7        A. No.
8        Q. And do you know if they have been working
9    on these towers over the course of the last 20 some
10   years on a routine basis?
11       A. I can only assume that you're representing
12   it to me because I don't know. Do you know if one
13   of the things that they bring is that they have an
14   institutional knowledge of the PEPCO system, many
15   other utility companies, too, that allow them to go
16   and do the work because their men have been there
17   before?
18       MR. PHILLIPS: Objection to the question.
19       THE WITNESS: Ask that one more time
20   because you kind of lost me.
21   BY MR. FOLEY:
22       Q. Do you know if one of the things C. W.

---

**75**

1    Wright has to offer is that they have an
2    institutional knowledge of the PEPCO system that
3    allows their crews and their men to do this work
4    efficiently and safely?
5        MR. PHILLIPS: Objection.
6        THE WITNESS: I would say they are
7    supposed to have this knowledge but it wasn't
8    so in this particular case.
9    BY MR. FOLEY:
10       Q. And when you say it wasn't so, are you
11   referring to the specific crew that was there or
12   the C. W. Wright management team that was directing
13   that crew?
14       A. In this particular case, I can only assume
15   it would be the crew.
16       Q. Did you see that the length of experience
17   as to the most senior member of the C. W. Wright
18   personnel who was present at the time of this
19   accident, how many years he had been working for
20   C. W. Wright?
21       A. I think the foreman had been there for
22   about 20 years.

---

**76**

1        Q. Right. Have you seen any documents that
2    indicated that C. W. Wright had provided protocol
3    or instructions to PEPCO to say this is how the
4    work was going to be done on that particular day?
5        A. Not on that particular day but they have
6    presented documentation to PEPCO in regards to
7    their work methods and it's a one-page document.
8        Q. Do you have that in front of you?
9        A. I have it as an attachment to the report.
10       Q. Then let's go to it. What page is the
11   attachment?
12       A. Let me have it and I'll find it. It is
13   entitled "C. W. Wright Construction Company, Inc.,
14   Insulator Replacement Methods" and PEPCO should
15   have a copy of that.
16       Q. And this is labeled as Exhibit No. F; is
17   that correct?
18       A. Flip down to -- turn one page back the
19   other way and you'll see it right there. F, that's
20   correct.
21       Q. That's what I just did.
22       A. I just wanted to make sure that was the

---

77

1  right one.
2      Q.  And reviewing Exhibit F referenced the
3  indication where it describes the work in the
4  fashion that it was done in this case?
5      A.  That would be I think the last paragraph.
6      Q.  And read the last paragraph.
7      A.  Hold on just a second.  It says, "In
8  addition to the above, another acceptable work
9  method is to use blocks and ropes or cables to
10 lower a double dead end assembly to ground level
11 where it could be serviced by other employees.
12 This method can only be used in situations where
13 there are conductors dead ended from two directions
14 and the conductor tension is the same on each side,
15 the line is straight and there are no obstructions
16 at a lower level that would prevent the assembly
17 from reaching ground level.
18      Additionally, the location where blocks
19 are attached to the structure must be of sufficient
20 strength to handle the stress strain and must be
21 supported with additional bracing.  A block is
22 placed above the double dead end assembly, another

78

1  at ground level and a rope and cable to be used is
2  threaded from the truck or tractor through the
3  ground level block then through the upper level
4  block and back down to the double dead end assembly
5  to be lowered.  The rope and cable will then be
6  tightened until a lineman who has climbed the
7  structure can remove the pins connecting the dead
8  end assembly to the structure and the entire
9  assembly is lowered to ground level.
10      After the insulator replacement is
11 complete the entire double dead end assembly is
12 lifted back in position with the ropes and cables
13 and the lineman replaces the pin to attach the
14 double dead end assembly back to the structure.  No
15 matter which method is used, care must be taken to
16 allow for changes in the amount of direction of
17 stress and strain."
18      Q.  Is that the actual method that was used in
19 this case?
20      A.  From what I gather, more or less.
21 Approximately, yes.
22      Q.  Did they provide the bracing that was

79

1  required by C. W. Wright's own requirements?
2      A.  They did not require the bracing because
3  that's PEPCO's tower.  And if they don't have any
4  engineers on staff, no design capacity, there's no
5  way they could go up and actually design bracing
6  for that arm.  That's PEPCO's job.
7      Q.  Did you read in here and again in the
8  first two sentences, it required C. W. Wright only
9  to use that method if the location could handle the
10 load, and then second talked about using bracing to
11 be able to widen the load.  Am I missing something
12 there?
13      A.  Let me read it again.
14      MR. FOLEY:  We have one copy, Dick.
15 That's why I'm letting him read it instead of
16 me.
17      MR. PHILLIPS:  Looks like there are
18 pictures on their website of it.
19      THE WITNESS:  It says, "The location where
20 the blocks are attached to the structure"--when
21 they say blocks, they're talking about
22 pulleys--"must be of sufficient strength to

80

1  handle a stress strain or it must be supported
2  with additional bracing."
3  BY MR. FOLEY:
4      Q.  Thank you.  So to be able to use this
5  system, you have to pick a location, if you're
6  C. W. Wright, that can handle the load or if you
7  don't, you have to use additional bracing so that
8  the load is distributed, correct?
9      A.  I'm not exactly sure when they say
10 bracing, it's not clear in that document as to
11 whether the bracing is for the pulley itself or if
12 it's actually additional bracing in the tower
13 itself.  So I don't know.  It's kind of a vague way
14 of saying it.
15      Q.  Did you see the report done by OSHA and
16 the report done by C. W. Wright after this event?
17      A.  Yes.
18      Q.  And both of them were critical--C. W.
19 Wright of its own crew--of the way they implemented
20 this work; is that correct?
21      A.  Yes.
22      Q.  And the reason is is that they put load in

81

1 the middle of an unbraced arm and then didn't brace
2 it in any fashion to be able to distribute the
3 load, correct?
4    A. That's correct.
5    Q. And the OSHA persons issued violations to
6 C. W. Wright as a result of that, and on top of
7 that C. W. Wright in its own report said our crews
8 messed up here, right?
9       MR. PHILLIPS: Objection.
10       THE WITNESS: I cannot remember if those
11 words were used, "messed up."
12 BY MR. FOLEY:
13    Q. Okay. That was legal. The C. W. Wright
14 report indicated the errors done by the crews in
15 this regard as well, correct?
16       MR. PHILLIPS: Objection. Go ahead.
17       THE WITNESS: Could you find it and
18 actually read it to me?
19 BY MR. FOLEY:
20    Q. I cannot.
21    A. Okay. I do know that they were charged --
22 OSHA charged them with three violations. I know

82

1 that.
2    Q. Including where the location of the
3 bracing was, correct?
4       MR. PHILLIPS: But there was no bracing.
5 That's the whole point.
6 BY MR. FOLEY:
7    Q. The failure of C. W. Wright is what the
8 allegation was to brace, correct?
9       MR. PHILLIPS: Now, I think you're trying
10 to create something that doesn't exist there.
11 I mean his opinions he's expressed or will
12 express--I believe he's expressed in his
13 report--is not impacted by what C. W. Wright
14 did or didn't do. I think if you ask him about
15 that, you're going to find that out. The fact
16 that MOSHA may have had some opinion doesn't
17 mean that he either agrees with it or that it
18 is exculpatory of PEPCO's responsibility.
19 BY MR. FOLEY:
20    Q. Do you believe that the OSHA criticism of
21 C. W. Wright was correct or incorrect?
22       MR. PHILLIPS: Objection. Go ahead. By

83

1 the way, do we have the document? Are we
2 speculating? Let's look at what it is you want
3 him to comment on.
4       THE WITNESS: Yeah. I would prefer you do
5 that. Let's produce the documents and read
6 through them.
7 BY MR. FOLEY:
8    Q. You have reviewed the OSHA report,
9 correct?
10    A. I reviewed it, yes.
11    Q. They cited them for various failures,
12 correct?
13    A. That's correct.
14    Q. And what I'm talking about is the failure
15 related to improper bracing where they were
16 critical of C. W. Wright. Were you in agreement or
17 disagreement when you read the OSHA report
18 regarding the violations?
19       MR. PHILLIPS: I don't think that's a fair
20 question without showing him the particular
21 language that you're requiring him to comment
22 on and I'm not sure that it's fair anyway but,

84

1 you know, you've got to show him the language.
2 It's not fair to summarize it and then ask him
3 to agree or disagree with what your
4 summarization is.
5       MR. FOLEY: He can certainly comment and
6 agree or disagree. He's a well-honed expert
7 who can agree or disagree. I get to ask the
8 questions.
9 BY MR. FOLEY:
10    Q. I'll ask it in a broader direct sense.
11 Did C. W. Wright -- were they negligent in the
12 fashion that they attempted to do this work?
13    A. I would say based on the OSHA report, yes.
14    Q. Okay. And was there anyone from PEPCO
15 present when this work was being done?
16    A. I don't think so.
17    Q. Let's assume for the purpose of the next
18 questions that they were not present. Do you have
19 any basis for saying that PEPCO was aware that
20 C. W. Wright on this particular day was putting a
21 load in the middle of the beam in the fashion they
22 did without bracing it?

22 (Pages 85 to 88)

85

1    MR. PHILLIPS: I'm going to object to that
2 question but you can answer it if you have any
3 knowledge.
4    THE WITNESS: Ask the question again.
5 BY MR. FOLEY:
6    Q. Do you have any basis for saying that
7 PEPCO had actual knowledge that the C. W. Wright
8 crew was negligently doing its insulator
9 replacement work?
10    MR. PHILLIPS: That's two questions in one
11 or it assumes --
12    MR. FOLEY: He just said that he agreed
13 that they did the work negligently. Now I
14 asked him if he had knowledge that PEPCO knew
15 it.
16    MR. PHILLIPS: And you're asking it
17 specifically on this particular day and the
18 point is they did it all the time. That's the
19 way they did it all the time.
20    MR. FOLEY: We'll swear you in next and
21 you can testify for me. I'm going to get his
22 answer, Dick. Okay? I'm going to try one more

86

1 time. You object and then we'll both shut up
2 and listen to the witness. All right?
3    MR. PHILLIPS: That sounds good to me.
4 BY MR. FOLEY:
5    Q. Do you have any basis for saying that
6 PEPCO had knowledge that C. W. Wright was
7 negligently performing the insulator repair work on
8 that day?
9    A. PEPCO had to have known that they were
10 there. PEPCO had to know what types of methods
11 they were using on that particular tower because
12 it's a PEPCO tower, and I can only assume that
13 PEPCO knew that they were there. Now, as far as
14 the exact method, I'm not sure about it because you
15 can use a crane. You know, there's a variety of
16 methods. I can only assume that PEPCO knew that
17 they were there doing the work.
18    Q. There are four methods that C. W. Wright
19 could use, correct?
20    A. That's correct.
21    Q. And they're supposed to use their
22 specialized knowledge and take an approved method

87

1 and apply it to a specific tower, correct?
2    A. That's correct.
3    Q. And, for example, if the tower was braced,
4 it might allow for a certain type of work to be
5 performed; and where it's unbraced, they might
6 attack it a different way, right?
7    A. That's correct.
8    Q. And when you look at the tower, this arm
9 is clearly not braced in the middle, correct?
10    A. That's correct.
11    Q. It's not a latent condition; it's an
12 obvious one, right?
13    A. That's correct.
14    Q. And so the crew has to decide one of these
15 four methods to employ, correct?
16    A. That's correct.
17    Q. And the first one is they could use a
18 bucket truck. They didn't use a bucket truck that
19 particular day, correct?
20    A. I think they had two bucket trucks on site
21 but they were not tall enough to reach up that far.
22    Q. And they had other bucket trucks at other

88

1 sites, and instead of waiting for a higher bucket
2 truck, they decided to go with this method?
3    A. Correct. And I just want to interject one
4 point. Even though they were doing the work they
5 were doing, they were not engineers. As far as I
6 know, they don't have any engineers on staff and
7 they have no knowledge of engineering design. They
8 didn't know that this thing would collapse if they
9 did that.
10    Q. Do you have any understanding as to what
11 C. W. Wright holds its specialized knowledge out to
12 be that this is what they do for a living?
13    MR. PHILLIPS: Objection.
14    THE WITNESS: Other than what the
15 documents say, that's all I can rely on.
16 BY MR. FOLEY:
17    Q. And here we have a subcontractor a
18 contractor. There's no -- PEPCO is the customer
19 here, so they're a contractor, right?
20    A. That's correct.
21    Q. And their contract -- they're in their
22 area of specialty, correct?

Case 8:12-cv-00865-WGC Document 82-3 Filed 10/29/13 Page 24 of 42
DEPOSITION OF CARL EVANS KNIGHT MEIER, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

23 (Pages 89 to 92)

89

1     A.  That's correct.
2     Q.  And I'll ask you to assume for the purpose
3   of this question that they've worked on these PEPCO
4   towers for years, okay?
5     A.  Okay.
6     MR. PHILLIPS:  Excuse me.  I need to
7   interpose an objection.
8     MR. FOLEY:  What's the objection?
9     MR. PHILLIPS:  The objection is that you
10  are asking questions about what C. W. Wright
11  knew or didn't know and that is not an
12  appropriate question for this witness.  This
13  witness is here to talk about the design and
14  structure of the tower, not what C. W. Wright
15  knew or didn't know and it is irrelevant to his
16  opinions.  So you're not getting anywhere and
17  it's not within his area of expertise to
18  understand the business practices of C. W.
19  Wright.
20      What he is here to talk about is the fact
21  that this tower was not appropriately designed
22  because it didn't include methodology for how

90

1   this was to be done and specified for this
2   particular tower.  And so, you know, they were
3   left to make a Hobson's choice among the things
4   that they could do and they chose what they had
5   available.  What C. W. Wright knew or didn't
6   know has nothing to do with what PEPCO did or
7   didn't do when they designed this tower and
8   allowed people to go up there and risk their
9   lives to change these wires.
10      THE WITNESS:  And I agree with what he
11  said.
12      MR. FOLEY:  And I would move to strike it.
13      I think that the knowledge of C. W. Wright
14  as a contractor working within its area of
15  expertise, hired to do a specific job that they
16  had specialized knowledge of, indicating in
17  their contract that they were going to use the
18  means that would be safe and appropriate for
19  the tower in the absence of a PEPCO personnel,
20  for you to suggest that the customer is somehow
21  at fault for not saying go do it a different
22  way when they're not there, I think it is

91

1   highly relevant.
2     MR. PHILLIPS:  It's not.  It's not.
3     MR. FOLEY:  We don't have to win this
4   legal argument.  Win it or lose it another day.
5   I get to do my deposition.
6     MR. PHILLIPS:  Yeah.  But you have to stay
7   with appropriate questions.  And when you start
8   asking him to tell us what C. W. Wright knew or
9   didn't know, you're asking him to speculate and
10  that is not appropriate for him to testify to.
11      MR. FOLEY:  Well, it all started when he
12  said the crew didn't have engineers.  How would
13  they know?  And then it causes Fairley to put
14  their knowledge base even more in play here.
15      MR. PHILLIPS:  Mr. Foley, those comments
16  to him are in response to your saying, well,
17  C. W. Wright knew this and C. W. Wright knew
18  that.  His response is based on what he
19  believes he knows about how C. W. Wright is
20  formulated, etc., but that's not the issue.
21      MR. FOLEY:  We're wasting pages because
22  we're not getting any answers and we're happy

92

1   to talk to each other without a court reporter.
2     MR. PHILLIPS:  Ask him a question about
3   what his opinion is about whether or not the
4   tower was designed appropriately and why not
5   and then he'll tell you.
6     MR. FOLEY:  I'll give you a chance to do
7   all the follow-up you want to do.  It's
8   frustrating.  The other lawyers rarely ask the
9   questions the way you like them.
10      MR. PHILLIPS:  You're doing great.
11      MR. FOLEY:  Thank you.
12  BY MR. FOLEY:
13      Q.  C. W. Wright in its contract had the four
14  different methods that it could use to employ,
15  correct?
16      A.  That's correct.
17      Q.  And we talked about one being a bucket
18  truck, correct?
19      A.  That's correct.
20      Q.  If they brought an appropriate bucket
21  truck over, they could have done the work, correct?
22      A.  It would have to be a crane, not a bucket

Case 8:12-cv-00386-WGC Document 33-2 Filed 10/02/13 Page 25 of 42
DEPOSITION OF GARY EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

24 (Pages 93 to 96)

93

1   truck. You can use a bucket truck to lift
2   personnel up there but then you have to use a crane
3   to support the loads.
4       Q. And you went to the next one. You could
5   have a crane, correct?
6       A. That's correct.
7       Q. They also sometimes use ladders up there
8   doing the work, correct?
9       A. To, I guess, get to that point.
10      Q. And in addition to that, the method that
11  we talked about and I had you read into the record;
12  that is, the next to last paragraph in Exhibit No.
13  letter F that we've already been over, correct?
14      A. That's correct.
15      Q. And you agreed with me that the manner in
16  which C. W. Wright attempted to do that paragraph
17  was negligent, correct?
18      A. Run it by me again. Let's get it one more
19  time.
20      Q. You agreed with me that the manner in
21  which C. W. Wright attempted to implement this last
22  paragraph of Exhibit F was negligent?

95

1   forth that were used to lift this cable, the
2   pulleys and the lifting mechanism has to be
3   directly over that point.
4   BY MR. FOLEY:
5       Q. But they could have taken wires or cables
6   or bracing and supported them from the end of the
7   lateral end and the tower itself, correct?
8       A. I don't know. I don't think so. I would
9   have to think about that.
10      Q. You're saying that as an engineering
11  attempt is impossible to do?
12      A. I wouldn't say it's impossible but I have
13  not looked at that aspect of it, so I have no
14  opinion.
15      Q. Who selected where the pulley was going to
16  be put over the lateral arm? Was that PEPCO or
17  C. W. Wright?
18      A. As far as I know it would be C. W. Wright.
19      Q. And when that decision was made, was any
20  PEPCO personnel ever privy to that to your
21  knowledge?
22      MR. PHILLIPS: Objection. Go ahead. You

94

1       MR. PHILLIPS: Objection. Go ahead.
2       THE WITNESS: I would say yes, but again,
3   they're not engineers. If they do not have any
4   engineers on staff, they have no knowledge of
5   what this thing is capable of doing. The tower
6   crossarm -- they have no knowledge of what the
7   tower crossarm is going to do when they load it
8   in a particular way. They just didn't have the
9   knowledge, as far as I know.
10  BY MR. FOLEY:
11      Q. And that's an assumption you're making
12  regarding their management staff? You don't have
13  any particularized knowledge, correct?
14      A. That's correct.
15      Q. Could they have used blocks and pulleys
16  that were supported by the tower or the far side of
17  the arm and still been able to do the work that
18  they wanted just by using a combination of pulleys
19  and wires?
20      MR. PHILLIPS: Objection. Go ahead.
21      THE WITNESS: The rope or the connectors
22  or the Samson rope and the wire slings and so

96

1   mean on this particular day or in general?
2       MR. FOLEY: Talking about this day.
3       THE WITNESS: Ask me the question again.
4   BY MR. FOLEY:
5       Q. Was anyone for PEPCO privy to the place
6   they selected for the placement of this pulley
7   system?
8       A. I would say if they were not privy, they
9   should have been because they knew the methods that
10  were going to be employed or could be employed.
11      Q. And do you have a factual basis for that?
12      A. No.
13      Q. Let's talk about how this tragic accident
14  actually occurred.
15      A. Okay.
16      Q. And I kind of want to hear maybe a
17  narrative form, before we get to the whose fault is
18  it, what you think happened based upon your reading
19  of the C. W. report and the OSHA report and any
20  other documents that you provided. What was
21  happening there on the scene in the seconds
22  immediately before the failure of this lateral arm?

25 (Pages 97 to 100)

97

1    A.  From what I understand, and this is based
2  on the Power Point presentation created by C. W.
3  Wright, when they were lifting the cable back up to
4  its attachment point on the arm, they got it within
5  about a half a foot or so and then the arm
6  collapsed.
7        Prior to that, the original block and
8  tackle system was a system of two pulleys.  One
9  pulley was suspended from the lower crossarm from
10  the five by five angles and suspended at a point
11  right over the lower crossarm where they were going
12  to be working and they attached a wire rope to 52
13  and a half inch--I think, half inch, three-quarter
14  inch, whatever it was--diameter wire rope sling to
15  the wire itself.  They attached the Samson rope to
16  it.  They then fed that Samson rope through the
17  pulley and then back down to another pulley at the
18  base, and then the Samson rope at that point was
19  attached to the utility hooks of one of their
20  trucks.
21        Then once they changed out the insulators
22  and the corona rings, they then attempted with one

98

1  truck to apply a load to the Samson ropes and pull
2  this power line cable back up to its attachment
3  point on the crossarm end.  In doing so, the
4  documentation said that the truck was going up a
5  slight incline and it started to spin.  The
6  documentation said that they then found out that
7  there was some sort of a jam in the block and
8  tackle system, and they didn't specify where that
9  jam was located.
10        So they added an additional pulley down
11  below, if I understood the information correctly,
12  and then used a second truck to then take its hoist
13  and run the hoist cable through this second pulley
14  or block and attach it to the Samson rope.  And the
15  Power Point presentation then said that they
16  activated -- they actually operated both trucks
17  simultaneously and tried to pull this up.  One
18  truck had a wench and I think they were using the
19  wench in addition to the load of the other truck.
20  When they did that, they got it up to about a half
21  a foot from the tip of the crossarm and then it
22  collapsed on them and killed Mr. Eldredge.

99

1    Q.  How many times did the replacement
2  insulator get up within five or six inches of its
3  target and not be able to go the final six inches?
4    A.  I think I believe there was two attempts,
5  at least two attempts.
6    Q.  And both times it stops and gets stuck
7  just short of the goal line, as it were, correct?
8    A.  That's correct.
9    Q.  And in the first occasion, the force being
10  used to pull on the rope and you get the advantage
11  of pulleys, and pulleys actually give you a
12  mechanical advantage which gives you more strength
13  than without it, correct?  I can pull up with a
14  pulley what I couldn't pull up straight down,
15  correct?
16    A.  Yeah.  But there's not -- in this
17  particular case there's not a mechanical advantage
18  for the truck but there is, I guess, if you want to
19  call it a mechanical disadvantage to the crossarm.
20  Because when the Samson rope is connected to the
21  power line cable and the truck loads that Samson
22  rope by pulling it and actually supporting the

100

1  cable in the air, the tension in the cable from
2  what OSHA says is 365 pounds.  That was the weight
3  of the block and tackle system and the cable.  When
4  the cable loops over the sheave of that upper
5  pulley and then comes back down, you effectively
6  have two cables with 2,365 pounds in them and
7  you're now applying a load of --
8    Q.  We're going to the calculator.
9    A.  You're now applying a load of 4,730
10  pounds.  Not just a load of the cable itself but
11  it's resultant of -- the way this block and tackle
12  system is set up, it's actually pulling down on the
13  crossarm twice that weight.
14    Q.  It doubles?
15    A.  It doubles is right.
16    Q.  And you actually had to make a correction
17  in your report --
18    A.  That's right.
19    Q.  -- when you realized, hey, I forgot half
20  the load?
21    A.  That's right.
22    Q.  And all that assumes that the rope is

101

1  moving smoothly through the pulley system, correct?
2      A.  That's correct.
3      Q.  And if there is a jam and if the jam is
4  right at the pulley where it's connected to the
5  beam, we have a lot more force being brought down
6  on this lateral beam, correct?
7      A.  That's correct.
8      Q.  And factually what happened in this
9  instance is that the insulator goes up, gets about
10 five or six inches away from the target, jams, and
11 you have a truck, a big old bucket truck pulling
12 tires spinning, correct?
13     A.  That's correct.
14     Q.  How much force is being exerted down on
15 the beam at that point, this lateral beam that we
16 have been discussing?
17     A.  If the pulley does not jam, it's going to
18 be to 4,730.
19     Q.  I got that.
20     A.  But if it does jam, it's going to be
21 probably more than that.  A lot more.
22     Q.  A lot more?

102

1      A.  A lot more than that.
2      Q.  It's literally the truck's force of the
3  engine pulling against this metal beam that's
4  trying to hold the truck, correct?
5      A.  That's correct.
6      Q.  And the engine is gunning because they are
7  trying to get these last six inches?
8      MR. PHILLIPS:  Objection.  Calls for
9  speculation.
10     THE WITNESS:  That's correct.
11 BY MR. FOLEY:
12     Q.  Well, there was a jam, correct?
13     A.  Based on the documentation, but we don't
14 know if the jam was cleared or not.  They said that
15 they actually changed out some blocks, added some
16 blocks, and we don't know if the jam was cleared.
17     Q.  Well, we know that on the first attempt,
18 the insulator got up to about five or six inches
19 and they couldn't get it all the way up, correct?
20     A.  That's correct.
21     Q.  On the second attempt, they get to about
22 five or six inches and they can't clear it and then

103

1  the beam fails, correct?
2      A.  That's correct.
3      Q.  So the reasonable inference for you, who
4  does structural accident reconstruction, is that as
5  it's getting to this five- or six-inch distance,
6  that is where the jam is occurring, correct?
7      MR. PHILLIPS:  Objection.
8      THE WITNESS:  Without really knowing more
9  about the particular -- just for the record, I
10 never inspected the stuff, so I don't know.  I
11 couldn't really make a comment on that because
12 I just don't know what the condition the pulley
13 was in.  If we're relying strictly on the
14 Samson rope itself, the Samson rope wasn't
15 birdcaged.  It wasn't damaged in any way.  It's
16 just a big nylon rope and it should flow
17 smoothly through the pulley.
18     Q.  Emphasis should.  That doesn't mean it
19 did, correct?
20     A.  Well, that's true.
21     Q.  This insulator is a big piece of
22 equipment, right?

104

1      A.  I would assume so, yeah.
2      Q.  Eight feet wide or something like that?
3      A.  Yeah, it's big.
4      Q.  And so when you get this big insulator
5  almost to the yoke plate, there's a lot of
6  insulator there that can get in the way, too,
7  correct?
8      A.  I'm not really sure exactly what you mean.
9  You kind of lost me there.
10     Q.  As you're bringing the load up trying to
11 get it close, occasionally the load itself creates
12 the snag?
13     A.  Oh, it could if it hangs on something.
14     Q.  Yeah.  Like it gets caught on the beam or
15 the wire or the yoke plate that they're trying to
16 put it in or anything like that, correct?
17     A.  That's correct.  That's possible.
18     Q.  And in this case when they talk to Terry
19 Weber --
20     I'm going, Dick, right to the OSHA or the
21 MOSHA investigation that was part of the materials
22 that were provided to the expert.

105

1      And when they go to his statement, he
2  talks that the jam or the stopping occurs at the
3  same point with both efforts, correct?
4      A.  That's correct.
5      Q.  And so the most logical inference is that
6  that is where the jam is occurring, correct?
7      MR. PHILLIPS: Objection.
8      THE WITNESS: I would have to say yes in
9  this case but I don't know for sure.
10 BY MR. FOLEY:
11     Q.  I know that.  And as a result, you can't
12 calculate the amount of force that's actually being
13 put on this lateral beam, can you?
14     A.  Not without running tests, no.
15     Q.  And it would be very hard to come up with
16 a variable on -- like, for example, do we know the
17 power of the wench here?
18     A.  Well, a wench is by design, particularly a
19 wench that's attached to a big truck like this, it
20 will be pretty strong.
21     Q.  Very strong?
22     A.  Very strong, yes.

106

1      Q.  A wench attached to a pickup truck is very
2  strong.  That attached to a bucket truck is
3  probably even stronger, correct?
4      A.  Yes.  And they normally use the wenches to
5  pull themselves out of a stuck position more or
6  less.
7      Q.  That's one of the uses, when they're stuck
8  in bad weather and they have to drag this truck.
9  What's a bucket truck weigh, 10,000 pounds, 20,000?
10     A.  Without knowing, I would say probably at
11 least four or five tons, probably.
12     Q.  And so we have two additional forces that
13 are coming down on the lateral beam that haven't
14 been measured.  One is the power of this wench,
15 correct?
16     A.  That's correct.
17     Q.  And the second is the power of the bucket
18 truck with the wheel spinning, correct?
19     A.  That's correct.
20     Q.  And you have insufficient information to
21 be able to calculate that load or that force down,
22 correct?

107

1      A.  That's correct.
2      Q.  And would you say it is a significant
3  additional force much greater than just the force
4  of the load?
5      MR. PHILLIPS: Objection.  Go ahead.
6      THE WITNESS: If the pulley did jam, then
7  I would agree with that, yeah.
8  BY MR. FOLEY:
9      Q.  And you don't know -- you don't have any
10 independent information other than the fact that we
11 have just talked about where the pulley did jam,
12 correct?
13     A.  That's correct.
14     Q.  So now you have this additional force
15 coming down.  Do you have an opinion to a
16 reasonable --
17     MR. PHILLIPS: Wait.  I don't think that's
18 a fair rendition of what he just said.  He just
19 said that he doesn't know that it jammed and
20 now you're saying that you're assuming that it
21 did jam.
22     MR. FOLEY: I'll let the deposition speak

108

1  for itself.  I want to move on to another
2  question.
3  BY MR. FOLEY:
4      Q.  Would you agree with me that the designer
5  of the utility tower's lateral beam did not have to
6  factor in the amount of force that would be
7  generated by a bucket truck and a wench on a second
8  bucket truck simultaneously pulling down on a 4,700
9  pound load?
10     A.  Well, I can only assume that he didn't
11 because the thing is not designed to support that
12 type of load.  If PEPCO knew, and they should have
13 known, that these crews were going to be loading --
14 the potential for loading this structure in that
15 way, then they should have chose a tower that had
16 that middle bracing.  Because if you look at the
17 photos that I sent you or I have in my report of
18 the Duke Power design, just about all the Duke
19 towers, a large part of them, have bracing in that
20 middle arm.  The reason is because they probably --
21 I can only assume that they know that somebody's
22 going to be up there using a block and tackle to

109

1   service these lower arms.
2       Q.  Do you know that bracing is added in
3   utility towers when the towers get farther apart
4   from each other and the weight of the wires that
5   they're carrying becomes greater and they need to
6   brace it in those instances?
7       A.  I would say yes.
8       Q.  Do you know that the braces are used when
9   they have to make a turn or because of topography
10  there's going to be additional load on that lateral
11  arm?  Is that a reason they would put in bracing as
12  well?
13      A.  Absolutely, yeah.
14      Q.  Do you know if the towers that you looked
15  on for Duke, whether the reason that designer put
16  the bracing on was related to the load of the wire
17  versus the repair work that might be done?
18      A.  Off the top of my head, no.
19      Q.  And Duke Power also has towers without
20  bracing, correct?
21      A.  Yes.
22      Q.  And those towers are presumably designed

110

1   by an engineer for that utility company and he's
2   aware of the need of men to work on that lateral
3   arm as well, correct?
4       MR. PHILLIPS:  Objection.  That's not an
5   appropriate question.
6       MR. FOLEY:  It was when it was good for
7   you.
8       MR. PHILLIPS:  What?
9       MR. FOLEY:  It was when it was good for
10  you.
11      MR. PHILLIPS:  It's not an appropriate
12  question.
13  BY MR. FOLEY:
14      Q.  The National Electric Safety Code talks
15  about an expected load.
16      A.  Yes.
17      Q.  Do you have any reason to believe that an
18  expected load on this lateral arm would be the
19  force of two separate trucks pulling down?
20      A.  I would say that since PEPCO knew of their
21  methods that, yes, that would be an expected load
22  that could be applied to those beams.

111

1       Q.  And those methods, are you familiar with
2   anywhere where C. W. Wright has said that an
3   approved method of them doing work is to put two
4   separate trucks and pull and try to un-jam a load?
5       MR. PHILLIPS:  Objection.
6       THE WITNESS:  Ask that one more time.
7   BY MR. FOLEY:
8       Q.  Are you aware of any time where C. W.
9   Wright has given notice or knowledge to PEPCO that
10  it's going to use two different trucks with two
11  different lines to try to un-jam a load?
12      A.  No.
13      Q.  And do you have any independent factual
14  basis that the designer of this lateral arm should
15  have factored in this level of force being used on
16  the arm?
17      A.  I was a little bit distracted there.  I
18  apologize.  Do me a favor and ask that one more
19  time.
20      Q.  I'll ask a better question.  We have been
21  unable to quantify the amount of force that was
22  used by the C. W. Wright trucks in addition to the

112

1   weight of the load, correct?
2       A.  That's correct.
3       Q.  And do you know if --
4       MR. PHILLIPS:  Wait a minute.  I have to
5   interpose an objection to that because we have
6   not established and he hasn't agreed with you
7   that it necessarily included the weight of the
8   trucks or anything like that.  You're putting
9   words in his mouth there.
10  BY MR. FOLEY:
11      Q.  Do you know if the force of these two
12  trucks if pulled at the end where it was braced
13  would have been able to survive that sort of force?
14      A.  Are you asking me if connecting both the
15  trucks simultaneously if the crossarm would be able
16  to survive a force of that much?  In other words,
17  connect it directly to the arm and pull it?
18      Q.  Yeah.
19      A.  I don't know.
20      Q.  Okay.  You have a bunch of notes and you
21  made copies of some but not all; is that right?
22      A.  No.  You have a copy of all my case notes

---

113

1 right here.
2 Q. So these are all your notes?
3 A. That's right.
4 MR. FOLEY: Let's number that exhibit
5 next.
6 (Deposition Exhibit No. 3 was marked for
7 identification purposes.)
8 BY MR. FOLEY:
9 Q. Do you have your own copy?
10 A. No. I just have my original. That's your
11 copy right there. This is what I copied right
12 here, so this is my case notes.
13 Q. So let's just follow along. Can you give
14 me in terms of general statements what is being
15 discussed on page 1 of Exhibit 3?
16 A. Essentially the first sentence says I
17 applied for a Maryland P.E. license and I state
18 what the fees are, $178 total.
19 Q. And without being rude, it's not that
20 badly written. So if you tell me this is a running
21 log of what I did recently, I'm just trying to see
22 what we have on the pages because I've never seen

---

114

1 them before. If you read the whole thing, we'll
2 take forever.
3 A. Okay. I'm sorry. It's just a running log
4 of everything that I've done in this case. Down
5 the left-hand side column you see start, stop,
6 start, stop, start, all the times? That's when I
7 worked actually on the case. That's how I logged
8 my time and my billable hours.
9 Q. And when did you start your work in the
10 case?
11 A. This was on 3-19 of 2013, March the 19th.
12 Q. On page 3, what do we have in terms of
13 these drawings?
14 A. These are sketches, just some pencil
15 sketches of the way that the five by five angles in
16 the crossarms were loaded and how this thing was
17 rigged up based on the information that I got
18 through the documentation.
19 Q. So then help me because I am not an
20 engineer. What are we seeing in this triangle that
21 is on the top half?
22 A. The top half, if you'll notice, I'll have

---

115

1 two L-shaped figures.
2 Q. Yes.
3 A. On the right side as you look at the page,
4 it looks like it's the letter "L."
5 Q. Correct.
6 A. On the left said, it looks like a mirror
7 image of the letter "L."
8 Q. Sure.
9 A. Those represent the five by five angle
10 structures. They're horizontal beams in this
11 crossarm. And then the angular lines that go from
12 that point down to what appears to be a pulley --
13 Q. Right.
14 A. Little circle with some arrows drawn
15 downward, that represents the wire rope slings.
16 There were two 15-and-a-half-foot wire rope slings,
17 one attached to each one of these five by five
18 angles and they come down and meet at a common
19 point, which is the pulley.
20 Q. And I saw in your report you had
21 measurements of this five by five -- let me find
22 your report. Where were you getting those

---

116

1 measurements from, the OSHA report?
2 A. What measurements are you referring to?
3 Q. Let's make sure I'm following along. You
4 say, "According to OSHA report the power line's
5 tower middle crossarm was designed using two five
6 by five by .75-inch structural steel angles"?
7 A. That's correct.
8 Q. And where do we get that the steel angles
9 are three-quarter inch? Where is that in the OSHA
10 report?
11 A. It's actually in the report because I read
12 it.
13 Q. Are these important for your calculations
14 or not?
15 A. Yes.
16 Q. They are?
17 A. Yes.
18 Q. Then we better figure it out. Show me
19 where in the OSHA report they appear.
20 A. Let me find it.
21 Q. Are you looking for the report itself? I
22 can hand you the report if that helps.

Case 8:12-cv-00883-WGC Document 32-3 Filed 10/28/13 Page 31 of 42
DEPOSITION OF GARY EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

30 (Pages 117 to 120)

117

1    A.  I've got it right here.
2    Q.  You were trying to go to your notes?
3    A.  Yeah.
4    Q.  Okay.
5    A.  Now, just so you'll know, on this page
6  right here, this is -- there's a document that
7  lists Terry Weber, Frank Hand, Nick, Dustin
8  Twenter, and it says, "Date of exposure" and it
9  has, "Conditions, describe the following" and it
10  talks about some -- it has a paragraph here talking
11  about -- it talks about the design or the length of
12  these arms. So that's some of the information I
13  had to use.
14    Q.  And is that where it gives you the five by
15  five by three-quarter?
16    A.  Not yet. I'm going to have to find that.
17  The second paragraph talks about the rigging of the
18  block and tackle system and the weight of these
19  cables. Here we go. It says, "The wire rope sling
20  was choker wrapped around a five-inch by five-inch
21  wide by three-quarter inch thick angle iron
22  comprising the main structure of the middle arm."

118

1  So that's it right there.
2    Q.  So for a layperson, what are we describing
3  again that is five inches by five inches by
4  three-quarters of an inch?
5    A.  I'll show you a picture. That little
6  figure right there, that's it.
7    Q.  The L-shaped thing?
8    A.  The L-shaped thing.
9    Q.  And if that were thicker, if it were like
10  one inch as opposed to three-quarters inch, how
11  would that affect your calculations?
12    A.  It would be stronger.
13    Q.  And if it were a half inch instead of
14  three-quarters, it would be weaker?
15    A.  It would be weaker, that's right.
16    Q.  And would that have any effect on the
17  amount of force that is being derived here that
18  you're calculating?
19    A.  Well, it would affect my stress
20  calculations.
21    Q.  How so? Show me where you use the actual
22  numbers here on your notes.

119

1    A.  In this chart right here -- it's kind of
2  hard to hold this book up. What I'll do to is just
3  read this to you and we can get a copy of it.
4    Q.  What we'll do is just copy it afterwards.
5  For the record, we're reading a page out of one of
6  his books.
7    A.  Manual of Steel Construction.
8    Q.  And it will be added as Exhibit 4.
9        (Deposition Exhibit No. 4 was marked for
10  identification purposes.)
11        MR. PHILLIPS: Thank you.
12        (Discussion off record.)
13    Q.  During the break you looked at this book
14  and I was asking you where these calculations of
15  five by five and three-quarters inch were used and
16  we're going to mark it as Exhibit 4 but can you
17  verbalize a little bit for me?
18    A.  I'm looking at a page that's called
19  properties of designing. It's on page 1-56 and it
20  has some engineering data on five by five by
21  various thickness of angles from five-sixteenths of
22  an inch all the way to seven-eighths of an inch

120

1  thick, and three-quarters of an inch just happens
2  to be one of those. And what they do is when they
3  set these books up, they put the data in for
4  standard off the shelf structural members made of
5  various steels. These are the normal ways that
6  these things come designed. The numbers that I was
7  using was the -- and I actually see here that I
8  actually made a mistake. I chose the wrong numbers
9  on this chart right here that I'm going to have to
10  go back and correct in my report.
11        The two numbers that I referred to that I
12  was using in my calculations, actually three, was
13  the second area moment of inertia labeled capital
14  letter "I." And for a three-quarter inch thick
15  beam, it's supposed to be -- bear with me a minute.
16  There's two numbers that I wanted to read off. One
17  is "I" and is called a second area moment of
18  inertia, and it represents a resistance in bending
19  when you make stress calculations. I actually
20  picked the wrong one because this chart's kind of
21  busy. I used in my calculations 17.8 and it's
22  supposed to be 15.7. And what that does is it

121

1 shoots the bending stresses up even further. I
2 chose the wrong number.
3     Q.  Slow down so I understand.  What we are
4 measuring is the bending stress of what?
5     A.  Of the beam itself as it is loaded, based
6 on the information that I got.
7     Q.  And so the bending stress means how much
8 force is going to be put on that beam before the
9 metal starts to bend?
10    A.  That's correct.
11    Q.  And this metal that we're talking about,
12 this is part of the lateral arm?
13    A.  Yes.
14    Q.  And the mistake you made is you had the
15 bending strength being stronger or weaker?
16    A.  In this particular case, there is a
17 thickness of seven-eighths of an inch and I
18 actually chose the seven-eighths versus the
19 three-quarters.  When I glanced at it, I thought
20 that three-quarters is as far as it goes but I made
21 a mistake.  I'm going to have to go back and
22 correct that in my calculations, which is not a big

122

1 deal.
2     Q.  And how will it affect the calculation?
3     A.  It'll actually drive up the bending
4 stresses.
5     Q.  And by driving up the bending stresses, it
6 will do what?
7     A.  In other words, it makes the beam weaker.
8     Q.  And what is the assumption regarding the
9 metals that were used?  Are they all bent at the
10 same standard?
11    A.  No.  Based on what I have seen in my
12 calculations, these beams are made of high-strength
13 steel, probably some sort of an alloy.  Now, I can
14 go to -- let's see --
15    Q.  Before you go anywhere, I'm trying to get
16 the layperson and then you can take me to 202 and
17 beyond.
18    A.  Okay.
19    Q.  What was the assumption you made regarding
20 the metal that was used for this beam?
21    A.  I didn't make any assumptions.  I
22 calculated the design stresses or the -- I

123

1 calculated the bending stresses, the principal
2 stresses also the von Mises stresses which is
3 the final stress.  And that's what I did.  And
4 depending on the type of material, depending on --
5 that's the first thing that we as engineers have to
6 do to find out what these stresses are going to be
7 in this type of member.  Then we choose the
8 appropriate material to build it from.  And because
9 of the fact this thing has this type of -- is
10 loaded in this fashion or would be designed to be
11 loaded in this fashion, you have to choose the
12 appropriate material.  So based on what my
13 calculations show, I mean it actually was able to
14 hold, you know, this load for a period of time
15 until, you know, if there was a jam that took
16 place, I don't know.
17    Q.  And some additional force, right?
18    A.  Yeah.  Because it was actually able to
19 sustain this load for a period of time, and that
20 tells me that this thing was made out of real
21 high-strength steel.
22    Q.  When you give Mr. Phillips a corrected

124

1 report, it's just going to say that a beam was a
2 little weaker?
3     A.  Than what I have it here, yes.
4     Q.  Right.  But it was still sufficient to
5 maintain this load for a significant period of
6 time, correct?
7     A.  Yes, that's correct.
8     Q.  Just on the notes, just so I follow
9 through, we turn to the next one which appears to
10 be page No. 4.
11    A.  Is that my hand calculations where they
12 begin?  Okay.  I got it.
13    Q.  And what are you calculating on this page?
14    A.  If you notice this sketch up along the
15 top, the very first statement says, "Arm with block
16 and tackle loading beam" and I have a free body
17 diagram of the beam in a horizontal fashion drawn
18 on the page with the loads applied to the beam.
19 What I want to do is to try to describe to you what
20 these loads are.  The 560 pounds is the weight of
21 the beam.  That's what one of these beams weigh per
22 its length.  And I get that off of a chart where --

125

1 and I'm going to have to actually correct this
2 since I read the wrong column or the wrong row.
3 This particular beam weighs 23.6 pounds per linear
4 foot.
5     Q.  And that's on the assumption it's five by
6 five by three-quarter inch?
7     A.  That's correct.  And then you run the
8 numbers and it's actually going to be a little bit
9 less than 560.  The other load on the upper
10 left-hand end of that sketch, you'll see a little
11 arrow that goes up at an angle that says, "21
12 degrees."  That's the support that came down from
13 the mass that connected to the tip of this thing
14 or, you know, the tip end of it.  It's labeled RS.
15 It's just a reaction.  It's a support reaction.
16 And then at the tip is 1,120 pounds.
17     Since we have a three-dimensional frame
18 here, what I attempted to do was average the loads
19 across this thing.  Since I can only deal with one
20 member at a time, that's the most accurate way to
21 do it.  And so the 1,120-pound force that I have on
22 the tip represents half of the load of the cable.

126

1 Because we're dealing with two beams here, we have
2 to average them across that.  And if you multiply
3 it by two, it comes out to be 2,240 pounds.  That's
4 the actual load on the assembly.  And the
5 difference between 2,365 I and 2,240 should be the
6 rigging which is 125 pounds.  And so I subtracted
7 the rigging load on that tip on that end force
8 because that's the force that was already applied
9 to it on that second cross member, second crossarm,
10 because it was already supporting the load of the
11 cable.
12     The next force to its right pointing down
13 is the 2,365 load.  And that's the load on that
14 beam due to the block and tackle system, and that's
15 half of the total load that's being applied to it,
16 you know, to the whole assembly.
17     Q.  Right.
18     A.  On the far right-hand side, you'll see an
19 upper force at the tip called RM.  That's a
20 reaction sheer force simply because it's actually
21 bolted to the mass.  When you draw a free body
22 diagram of it, you have to actually indicate that

127

1 there is a load trying to sheer this thing off and
2 you have to account for that.
3     Q.  That's really the force that is trying to
4 almost pull it off from the tower?
5     A.  Just a sheer load.  Not a bending load but
6 a sheer load.
7     Q.  All right.
8     A.  Then on the right-hand side of this
9 sketch, you have a horizontal force pointing to the
10 left.  It's called RH.  That's the reaction force in
11 the horizontal direction.  And that's going to be
12 created due to the fact that the reaction -- the
13 support that's angled, you know, going up at an
14 angle when this thing's loaded, you have two
15 components.  You have a vertical and a horizontal.
16 This is the resultant.  This is the actual force
17 that that support sees along this line, and you
18 have a horizontal component and a vertical
19 component.  You have to be able to break this up
20 using trigonometry to show what the horizontal
21 compressive load is going to be in this member and
22 that's what this is for.

128

1     Then you have a little curved arrow
2 labeled MM and that's the reaction moment, or
3 torque, that will be applied to the beam.  In other
4 words it's like a torque.  We call it a moment but
5 it's essentially a torque to where when all these
6 forces start pulling on this thing, that's the
7 bending moment, if you will, or bending torque
8 where this thing's connected to the mass.  I'm
9 trying to kind of verbally describe all this stuff.
10     And then I have to sum up the vertical
11 forces, which I have where you see a Sigma, a
12 sideways Sigma, with FV, V as in Victor, and a
13 colon.  Those are the vertical forces.  And then
14 down at the next calculation or next set of
15 equations, I have the sum of the horizontal forces
16 which deal with RH and RS.
17     And then the next set of equations is
18 dealing with the sum of the bending moments of this
19 right-hand point where it's connected to the mass
20 itself.  And then I have an equation of
21 compatibility, which this particular member is
22 what's known as a statically indeterminant member—

129

1 because you have a support out here on the end,
2 that vertical RS support. There's a special way
3 that you deal with this type of problem to
4 calculate all your forces and bending moments and
5 so forth.
6     If you just follow along, then, IN.
7 There's two equations right here that represent
8 deflection equations for different ways that -- one
9 represents the load on the end of a cantilever beam
10 and the other represents a load at some midpoint
11 somewhere, and there's two different equations for
12 each one of the ways those things are loaded. And
13 I take these equations and plug them into the
14 appropriate places in the equation compatibility
15 and then plug in all the numbers and do all the
16 calculations. And then eventually on the next
17 page, if you roll over, I solve this equation for
18 RS. And based on what I'm seeing there, the RS is
19 2667.78.
20    Q. And that represents?
21    A. That represents the load -- that
22 represents the tensile load in this support that

130

1 goes off in an angle.
2    Q. Okay.
3    A. And then all the other equations, the
4 vertical horizontal forces and the bending moments
5 and all that stuff, once I get that number, I can
6 go back and plug that number in and calculate
7 everything else.
8    Q. Okay. And it looks like you did these
9 calculations last week, like April 16th, 17th; is
10 that right?
11    A. Yes. It was actually -- I started on them
12 before I started the report because I wanted to
13 find out how this thing might be loaded or how it
14 might be stressed, and I started on 4-16 which is
15 whatever day that was.
16    Q. Last Tuesday?
17    A. Last Tuesday, yeah.
18    Q. Are there any other notes that you have
19 that you haven't made copies for me?
20    A. No. That's it.
21    Q. And these other things here are what?
22    A. All these are the documents provided to me

131

1 by counsel except for --
2    Q. And those just are kind of an index for
3 it?
4    A. Yeah, that's right.
5    Q. And there's nothing substantive really in
6 there?
7    A. No. It's telling me where things are.
8    Q. And you have listed everything that was
9 provided by counsel in the report?
10    A. As far as I know, yes.
11    Q. So without copying all of this, I should
12 have the universe between the discovery
13 Mr. Phillips and I shared and the index that is
14 your report?
15    A. That's correct.
16    Q. In your report, you talked about potential
17 maintenance issues. Do you have an opinion to a
18 reasonable degree of certainty that this accident
19 was caused by a failure to maintain that lateral
20 beam?
21    A. Let me see. Run that by me one more time.
22    Q. Somewhere in your report you said that

132

1 maintenance issues may be involved. And before I
2 waste any time, I just want to find out do you have
3 an opinion to a reasonable degree of engineering
4 certainty that this accident was caused by a
5 failure to maintain that beam?
6    A. No.
7    Q. I mean it might be involved but you don't
8 have enough information, right?
9    A. Yeah. And remember I made a mention in
10 the documentation in my report here about
11 possible ---I talked about atmospheric
12 deterioration over time and those type of things.
13 I just wanted to put it in there to say that --
14    Q. It's possible?
15    A. -- it could be a factor. You just don't
16 know.
17    Q. You don't have any evidence from OSHA,
18 from C. W. Wright, from PEPCO that showed
19 deterioration being a cause of the problem?
20    A. No.
21    Q. You were going to educate me on this
22 von Mises stress. Assume I'm a liberal arts major.

Case 8:12-cv-00893-GJH Document 23-7 Filed 10/10/13 Page 35 of 42
DEPOSITION OF SKIP EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

34  (Pages 133 to 136)

133

1    Give me the 30-second version as to what you're
2    trying to capture that is specific to this
3    calculation.
4        A.  Von Mises stresses are -- it was a method
5    of calculating stresses that are used to design
6    members that are going to be loaded.  You want
7    to -- there are different stresses.  In my notes,
8    you have just the bending stresses.  There's an
9    equation in the textbook.  It is the Greek letter
10   Sigma is equal to M, as in Mary, Y, as in yoyo,
11   divided by I, and that is the bending stress for
12   rigid beams.  When you deal with aircraft where
13   these wings are really moving, stuff like that,
14   there's a big extension of that equation to that
15   effect and it does not apply in aircraft.  It's
16   only to structural steel members and the like.
17       There are three stresses that are going on
18   here.  You have the really large bending stress
19   pulled down by the pulley.  Because of the fact
20   that you have the support going off from the top at
21   an angle, it's causing a compressive stress in the
22   beam itself.  And because of the fact that the

134

1    cables -- and I can show you right here.  You have
2    a little sketch right here, just a CAD sketch,
3    where you have these angular lines going down
4    vertically.  That represents the wire rope slings
5    connected to the angle irons down to the pulley.
6    And because of the fact that these things are at an
7    angle, they have force components that are putting
8    a side load on these five by five angles toward
9    each other.  The load is minimal.  It's only about
10   276 pounds.  It's pretty much insignificant because
11   it will hold that.
12       So when it comes to bending stresses, I
13   can calculate what's called a resultant bending
14   stress that's going to be a summation through
15   what's known as Pythagorean theorem, a summation of
16   those X and Y bending stresses to get a resultant
17   stress.  And I can take that information and, using
18   the information in this book here, calculate the
19   principal stresses which are considered to be the
20   largest stresses inside the material.  If you could
21   take the material and slice it at different angles,
22   as you move the angle -- if you can move the

135

1    imaginary angle around in a piece of material, the
2    stresses will change.  And the principal stresses
3    represent the highest level of stresses in a piece
4    of material in and of itself.
5        Based on engineering technological
6    developments over the years, there's a gentleman by
7    the name of -- a German scientist by the name of
8    von Mises who developed another set of equations
9    that take into consideration strain energy and all
10   this other stuff.  And it is essentially the bible
11   or the last engineering calculation you make and
12   the stress that you want to go by when you design
13   something.  Once you know the product that you're
14   going to design, you want to go by the von Mises
15   stresses and not the principal stresses for that
16   type of thing.  I remember -- let me see if I can
17   find it.  I'm trying to find some handwritten notes
18   I put in here.
19       Q.  I don't think they're going to be critical
20   for my answer.  Do you need them?
21       A.  Well, I was trying to find it.  It's in
22   there.  I just can't find it.  My professor told me

136

1    when I was in school that you never, ever design
2    with principal stress.  He said they're evil.  He
3    said they can be in error 50 percent of time and
4    tell an engineer that the member is twice as strong
5    as it actually is.  So they found out if you use
6    the von Mises stress, you eliminate that
7    possibility and you use those numbers to design.
8    That's the reason why I wanted to put them in the
9    report.
10       Q.  Have I covered all the opinions that you
11   have regarding this case?
12       MR. PHILLIPS:  If I can help, the one
13   thing you might ask him is whether he thinks in
14   order for this to be properly designed it
15   needed to have provided with it appropriate
16   methodologies for changing out these -- in
17   other words, it should have come with some
18   instruction.
19       THE WITNESS:  I agree with him.
20       MR. PHILLIPS:  That's the only thing I
21   know of that you've missed.
22   BY MR. FOLEY:

Case 8:12-cv-00860-GJH Document 138-1 Filed 10/09/13 Page 36 of 42
DEPOSITION OF GARY EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

35 (Pages 137 to 140)

---

**137**

1  Q. Is that somewhere in your report?

2  A. I don't think I wrote it in there, no.

3  Q. And was that an idea of counsel or was

4  that your idea?

5  A. That's actually my idea. I just didn't

6  put it in there because this was a rush report. I

7  just had a very limited amount of time to put this

8  stuff together.

9  Q. Let me just follow up, then, because I

10  hadn't heard this before. You believe that the

11  designer of the utility tower should have designed

12  it in a different fashion to affect insulator

13  replacement?

14  A. Yes. And I just want to follow up to say

15  the reason why I say yes is because PEPCO should

16  have known that these people were going to be up

17  there loading this thing in this way. Also I want

18  to say that PEPCO, since these are their towers --

19  I just want to make some comments about this. When

20  you ride down the road and you see a cell phone

21  tower, cell phone towers -- I talked to a guy that

22  used to build them. He said when you look at that

---

**138**

1  tower, you're looking at a million dollars. Over a

2  million probably now with the materials cost. And

3  all it's doing is holding up antennas. That's all

4  it's doing.

5  These big space trusses we're talking

6  about are designed to hold much, much more than

7  that. They're much stronger, made out of much

8  better materials, they're much bigger. And I can

9  guarantee you when you see one of those towers,

10  you're talking probably several million dollars for

11  one of those towers. That's just speculation on my

12  part. I don't know. But these towers are very

13  expensive because they have a lot of material in

14  them. And it's going to be high-strength steel,

15  which they charge you a premium price for this

16  stuff.

17  Having said that, PEPCO or any company

18  that has this type equipment when they subcontract

19  people to come in and actually work on it, they

20  have to know they should have their own procedure.

21  PEPCO should have their own procedures to work on

22  these towers. And based on what I have seen, I

---

**139**

1  have seen no evidence of that at all. They're

2  relying on the expertise of subcontractors to go in

3  and do this work. And if the methodologies are

4  wrong or PEPCO knows that they're going to be doing

5  this type of thing, then these towers need to be

6  designed to support these, quote, unquote, expected

7  loads.

8  Q. Are you aware of the various ways

9  insulator replacement is done on utility towers

10  around the country?

11  A. I can only speculate on what I read so

12  far.

13  Q. And so you have no expertise there? Your

14  only knowledge is what you've read in that one page

15  from C. W. Wright?

16  A. Plus my calculations.

17  Q. But I'm just talking about insulator

18  repair.

19  A. Yeah.

20  Q. And the insulator repair, if they had used

21  a crane, there would be no problem, correct?

22  A. That's correct.

---

**140**

1  Q. If they had a bucket truck and they didn't

2  have a man up there, they would have no problem,

3  correct?

4  A. If they had a bucket truck and they had no

5  man up there?

6  Q. Yes, no man on the tower. They wouldn't

7  have had a problem, correct?

8  A. I see what you're saying. Yes, that's

9  correct.

10  MR. PHILLIPS: Wait a minute. You mean no

11  problem in that it wouldn't have failed or no

12  problem in that he wouldn't have been crushed

13  by it?

14  BY MR. FOLEY:

15  Q. If they had used a system where a pulley

16  was placed at a braced area, they would have had no

17  problem, correct?

18  A. That's correct.

19  Q. And if they had not hooked up two trucks

20  when it jammed, they would have had no problem,

21  correct?

22  MR. PHILLIPS: Objection. He has not said

36 (Pages 141 to 144)

141

1  that it didn't.
2      MR. FOLEY: He actually has but you have
3  said it hadn't jammed. But go ahead.
4      THE WITNESS: I can only assume from what
5  I read in the documentation that there was some
6  issue of jamming.
7  BY MR. FOLEY:
8      Q. Right. And the reason you can't figure
9  out the total amount of force that was placed on
10 this beam is because you don't know -- we don't
11 have sufficient information to quantify that,
12 correct?
13     A. That's correct.
14     MR. FOLEY: I don't have any other
15 questions. Do you have any that you would like
16 to do, Mr. Phillips?
17     MR. PHILLIPS: No. I think he's covered
18 it.
19     MR. FOLEY: All right. He wanted to read.
20 He wanted to make sure that was okay with you.
21     MR. PHILLIPS: Yeah, readings's fine.
22     MR. FOLEY: You are supposed to put on the

142

1  record what you want in terms of a transcript.
2  I'm ordering the primary. I'm ordering an
3  E-transcript and a mini, just so you know.
4      MR. PHILLIPS: I think what I'll do for
5  now is -- let me ask the court reporter: Can I
6  come along three months from now and order this
7  if I need to? Because my client has limited
8  funds.
9      MADAM COURT REPORTER: Yes, that is an
10 option.
11     MR. PHILLIPS: In that case, I will wait.
12     (Signature having not been waived,
13 the deposition of GARY EVANS KILPATRICK, P.E.
14 was concluded at 3:50 p.m.)
15
16
17
18
19
20
21
22

143

1          ACKNOWLEDGMENT OF DEPONENT
2
3      I, GARY EVANS KILPATRICK, P.E., do hereby
4  acknowledge that I have read and examined the
5  foregoing testimony, and the same is a true, correct
6  and complete transcription of the testimony given by
7  me and any corrections appear on the attached Errata
8  sheet signed by me.
9
10
11
12 _____   _____
13  (DATE)          (SIGNATURE)
14
15
16
17
18
19
20
21
22

144

1      CERTIFICATE OF ADMINISTRATION OF OATH
2
3  STATE OF NORTH CAROLINA
4  COUNTY OF WAKE
5
6      I, Cynthia S. Boyd, Notary Public, do
7  hereby certify that GARY E. KILPATRICK, P.E. ,
8  personally appeared before me on the 23rd day of
9  April, 2013, and was administered the oath by me
10 prior to the taking of the foregoing deposition.
11
12     In witness whereof, I have hereunto set my
13 hand this 23 day of April, 2013.
14
15
16
17
18
19 _____
20 YNTHIA S. BOYD, CSR, RPR
21 Notary Public
22 My commission expires 3-19-2015

145

CERTIFICATE OF REPORTER

I, Cynthia S. Boyd, the officer before whom the foregoing proceeding was taken, do hereby certify that said proceedings, pages 1 through 125, inclusive, is a true, correct and verbatim transcript of said proceeding.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was heard; and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, and am not financially or otherwise interested in the outcome of the action.

_____
Cynthia S. Boyd, RPR
Certified Court Reporter

---

146

ERRATA SHEET

IN RE: Lister, et al -v- PEPCO Holdings, Inc.,
et al

RETURN BY: GARY EVANS KILPATRICK, P.E.

PAGE   LINE   CORRECTION AND REASON

6   ___   ___   _____
7   ___   ___   _____
8   ___   ___   _____
9   ___   ___   _____
10  ___   ___   _____
11  ___   ___   _____
12  ___   ___   _____
13  ___   ___   _____
14  ___   ___   _____
15  ___   ___   _____
16  ___   ___   _____
17  ___   ___   _____
18  ___   ___   _____
19  ___   ___   _____
20  ___   ___   _____
21  _____   _____
22  (DATE)        (SIGNATURE)

---

147

ERRATA SHEET CONTINUED

IN RE: Lister, et al -v- PEPCO Holdings, Inc.,
et al

RETURN BY: GARY EVANS KILPATRICK, P.E.

PAGE   LINE   CORRECTION AND REASON

6   ___   ___   _____
7   ___   ___   _____
8   ___   ___   _____
9   ___   ___   _____
10  ___   ___   _____
11  ___   ___   _____
12  ___   ___   _____
13  ___   ___   _____
14  ___   ___   _____
15  ___   ___   _____
16  ___   ___   _____
17  ___   ___   _____
18  ___   ___   _____
19  ___   ___   _____
20  ___   ___   _____
21  ___   ___   _____
22  (DATE)        (SIGNATURE)

144

1              CERTIFICATE OF ADMINISTRATION OF OATH

2

3    STATE OF NORTH CAROLINA

4    COUNTY OF WAKE

5

6         I,  Cynthia S. Boyd,  Notary Public, do

7    hereby certify that  GARY E. KILPATRICK, P.E.    ,

8    personally appeared before me on the 23rd day of

9    April, 2013, and was administered the oath by me

10   prior to the taking of the foregoing deposition.

11

12         In witness whereof, I have hereunto set my

13   hand this 23 day of April, 2013.

14

15

16

17

18

19   _____

20   YNTHIA S. BOYD, CSR, RPR

21   Notary Public

22   My commission expires 3-19-2015

145

1                    CERTIFICATE OF REPORTER

2

3            I, Cynthia S. Boyd, the officer before

4    whom the foregoing proceeding was taken, do hereby

5    certify that said proceedings, pages  1  through

6    125, inclusive, is a true, correct and verbatim

7    transcript of said proceeding.

8

9            I further certify that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this proceeding was

12   heard; and further, that I am not a relative or

13   employee of any attorney or counsel employed by the

14   parties thereto, and am not financially or

15   otherwise interested in the outcome of the action.

16

17

18

19

20   _____

21   Cynthia S. Boyd, RPR

22   Certified Court Reporter

DEPOSITION OF GARY EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

144

```
1            CERTIFICATE OF ADMINISTRATION OF OATH

2

3    STATE OF NORTH CAROLINA

4    COUNTY OF WAKE

5

6         I,  Cynthia S. Boyd,  Notary Public, do

7    hereby certify that  GARY E. KILPATRICK, P.E.   ,

8    personally appeared before me on the 23rd day of

9    April, 2013, and was administered the oath by me

10   prior to the taking of the foregoing deposition.

11

12         In witness whereof, I have hereunto set my

13   hand this 23 day of April, 2013.

14

15

16

17

18

19   _____

20   YNTHIA S. BOYD, CSR, RPR

21   Notary Public

22   My commission expires 3-19-2015
```

DEPOSITION OF GARY EVANS KILPATRICK, P.E.
CONDUCTED ON TUESDAY, APRIL 23, 2013

145

1                    CERTIFICATE OF REPORTER

2

3         I, Cynthia S. Boyd, the officer before

4    whom the foregoing proceeding was taken, do hereby

5    certify that said proceedings, pages  1  through

6    123, inclusive, is a true, correct and verbatim

7    transcript of said proceeding.

8

9         I further certify that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this proceeding was

12   heard; and further, that I am not a relative or

13   employee of any attorney or counsel employed by the

14   parties thereto, and am not financially or

15   otherwise interested in the outcome of the action.

16

17

18

19

20   _____

21   Cynthia S. Boyd, RPR

22   Certified Court Reporter